LEIMAN ET AL. *v.* GUTTMAN ET AL.

No. 88.  Argued December 13, 1948.—Decided January 17, 1949.

*Samuel Marion* argued the cause and filed a brief for petitioners.

*Leo Praeger* and *Barney Rosenstein* argued the cause and filed a brief for respondents.

*Solicitor General Perlman, Roger S. Foster* and *George Zolotar* filed a brief for the Securities & Exchange Commission, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Section 221 of Ch. X of the Bankruptcy Act, 52 Stat. 897, 11 U. S. C. § 621, provides:

"The judge shall confirm a plan if satisfied that . . . .

"(4) all payments made or promised by the debtor or by a corporation issuing securities or acquiring

property under the plan or by any other person, for services and for costs and expenses in, or in connection with, the proceeding or in connection with the plan and incident to the reorganization, have been fully disclosed to the judge and are reasonable or, if to be fixed after confirmation of the plan, will be subject to the approval of the judge . . . ."

The question presented by this case is whether that provision gives the bankruptcy court exclusive jurisdiction over petitioners' claim for services as attorneys in the reorganization of Pittsburgh Terminal Coal Corp., the debtor.

Petitioners were attorneys for a protective committee representing public holders of the preferred stock of the debtor. The committee had on deposit 584 shares of the preferred stock from four stockholders. The committee agreed to hold those shares in escrow for the purpose of affording petitioners "additional compensation" for their services in the reorganization proceedings of the debtor.[1]

Petitioners rendered valuable service in connection with the reorganization. When the plan was confirmed, they applied to the bankruptcy court for an allowance. That

---

[1] The relevant part of the escrow agreement provided:

"These shares are held in escrow by this Committee pending the termination of all proceedings in the matter of the Pittsburgh Terminal Coal Corporation.

"This Committee has secured these shares from the stockholders listed above for the purpose of affording to you additional compensation for your services in the above matter. They have been obtained and are held in escrow on the condition that they be delivered to you only at such time as the reorganization proceedings in the matter of Pittsburgh Terminal Coal Corporation are finally terminated and a final settlement of all suits and claims made by this Committee in behalf of the preferred stockholders have been settled. It is further conditioned upon faithful and satisfactory performance of your duties as counsel to this Committee until the termination of all proceedings."

court allowed them $37,500 out of the estate. It concluded that, while that amount was all the estate should bear, their services were worth more than the allowance. But it held that it had no jurisdiction to pass on the amount of the allowance which should be paid under the escrow agreement. *In re Pittsburgh Terminal Coal Corp.,* 69 F. Supp. 656.

Since in their view that court did not have jurisdiction of the claim, petitioners did not appeal from that order but brought instead the present suit in the New York courts for specific performance of the escrow agreement and for delivery of the deposited stock in accordance with the terms of that agreement. The Court of Appeals answered in the negative the following certified question:

> "Has the Supreme Court of the State of New York jurisdiction over the subject matter of this action to recover for legal services rendered to the stockholders committee which are not compensable out of the assets of the Debtor's estate, in a Chapter X reorganization proceeding under the United States Bankruptcy Act?" 297 N. Y. at 204.

The case is here on a petition for certiorari which we granted because of the importance of the question in administration of the Act.

We reviewed in *Woods* v. *City Bank Co.,* 312 U. S. 262, and *Brown* v. *Gerdes,* 321 U. S. 178, the design of Ch. X insofar as fees and allowances are concerned. There we were dealing with fees and allowances payable out of the estate. Here we are dealing with fees which are incident to the reorganization but not payable out of the estate. Under the less comprehensive language of § 77B the leading authority was that the bankruptcy court had jurisdiction over the latter claims as well. *In re McCrory Stores Corp.,* 91 F. 2d 947. We would be unmindful of history and heedless of statutory language if we held

that the power of the bankruptcy court in this respect had been contracted [2] as a result of Ch. X.

The control of the judge is not limited to fees and allowances payable out of the estate. Section 221 (4) places under his control "all payments made or promised" (1) by "the debtor" or (2) "by a corporation issuing securities or acquiring property under the plan" or (3) "by any other person" for services rendered "in connection with" the proceeding or "in connection with" the plan and "incident to" the reorganization. The services of petitioners concededly met those requirements; and the committee against whose stock a lien is sought to be asserted would plainly be included within the words "any other person." Moreover, these petitioners are included in the classes of claimants to whom the judge is empowered to allow reasonable compensation.[3] To lift petitioners' claim from § 221 (4) would therefore be to rewrite it or to hold that when extended so far it was unconstitutional. The latter has not even been intimated. The former is not permissible.

---

[2] The indicated purpose was to strengthen, not to impair, the existing controls which § 77B established in regard to allowances. See Sen. Rep. No. 1916, 75th Cong., 3d Sess. 22 (1938); H. R. Rep. No. 1409, 75th Cong., 1st Sess. 45 (1937).

[3] Section 242 provides:

"The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in connection with the administration of an estate in a proceeding under this chapter or in connection with a plan approved by the judge, whether or not accepted by creditors and stockholders or finally confirmed by the judge—

"(1) by indenture trustees, depositaries, reorganization managers, and committees or representatives of creditors or stockholders;

"(2) by any other parties in interest except the Securities and Exchange Commission; and

"(3) by the attorneys or agents for any of the foregoing except the Securities and Exchange Commission."

6

The aim of the expanded controls over reorganization fees and expenses is clear. The practice had been to fix them by private arrangement outside of court.[4] The deposit agreement under which committees commonly functioned was viewed as a private contract,[5] which granted the committee a lien on the deposited securities for its fees and expenses. By terms of the agreement the committee was normally the sole judge of their amount.[6]

[4] See Part VIII, Protective Committee Report, Securities and Exchange Commission (1940), pp. 232 et seq.

[5] See Habirshaw Elec. Cable Co. v. Habirshaw Electric Cable Co., Inc., 296 F. 875, 879.

[6] See Part I, Protective Committee Report, Securities and Exchange Commission (1937), pp. 642, 644, 645, 646–647:

"An examination of the 846 deposit agreements received with replies to the Commission's questionnaire reveals that 841 agreements, or 99.4 percent, provided that the committee should be entitled to fees or expenses or both. Of those 841 deposit agreements, 672 agreements, or 79.9 percent, gave the committee an express lien upon the deposited securities, for expenses or compensation, or both. 742, or 88.2 percent, clothed the committee with power to pledge deposited securities to secure loans to finance its activities. These powers commonly may be exercised by the committee in its sole discretion free from supervision by any independent agency or by the depositors."

.        .        .        .        .

"The deposit agreements provide little check upon the amounts the committees may charge for fees and expenses. As we have stated above, 841 of the 846 deposit agreements that we examined provided that the committee should be entitled to payment of its fees or expenses or both. In 469 the amount of compensation and expenses which the committee might charge against the deposited securities was unlimited. That is to say, in 55.4 percent of the cases neither the aggregate amount nor the amount per unit of securities which committees could claim for their expenses and services was limited.

.        .        .        .        .

"in the 705 cases not associated with Section 77 or Section 77B proceedings machinery was provided for having some independent

This gave rise to serious abuses. There was the spectacle of fiduciaries fixing the worth of their own services and exacting fees which often had no relation to the value of services rendered.[7] The result was that the effective amount received by creditors and stockholders under the plan was determined not by the court but by reorganization managers and committees.

Hence Congress instituted controls, controls which became more pervasive as § 77B was evolved into Ch. X. Section 211 requires that a committee file with the court a statement disclosing specified information, including the agreement under which it operates.[8] The scrutiny clause of § 212 gives the court power to set aside any of

person or agency review the amount of the fees and expenses of these committees in only 2.13 percent of the cases. In the balance of the cases, numbering 690, the committee had reserved to itself the right to determine, within the limits prescribed by the agreement, the amount which it could charge for fees and expenses. And in 403 of these 690 cases, the agreements prescribed no limitations. These fiduciaries, therefore, had in the vast majority of the cases provided machinery whereby they became the sole arbiters of the worth of their own services and of the propriety of their expenses. As we have pointed out, it was usually provided that the compensation to be fixed by the committee must be 'reasonable.' But this restriction in and of itself would mean little, since the committee and the committee alone was to determine what was 'reasonable.' And it is no answer to say that a court of equity would review these fees on complaint of a depositor and disallow sums beyond a 'reasonable' amount or disallow improper items of expense. Such relief would necessitate litigation by the depositors. Considering the time, expense, and difficulty of legal questions involved, such a remedy would for all practical purposes furnish no check whatsoever on the extravagance of committee members."

[7] See Part II, Protective Committee Report, Securities and Exchange Commission (1937), pp. 351 *et seq.*

[8] It is to be noted that while this provision only applies to committees representing more than twelve creditors or stockholders, the scrutiny clause contained in § 212 and the power to control allowances contained in § 221 (4) is not so restricted.

the provisions of such an agreement which it finds to be "unfair or not consistent with public policy." And § 221 (4) is written in pervasive terms—it applies to "all payments" for services "in connection with" the proceeding or "in connection with" the plan and "incident to" the reorganization, whoever pays them.[9] A statute establishing such broad supervision over committees cannot be presumed to be niggardly in its grant of authority when it deals with the matter which of all the others has the most direct impact on those whom it aims to protect.

We can find in this language no exemption for the kind of committee that petitioners represented. The fact that the committee may have represented a smaller or more intimate group than a conventional committee is irrelevant. The statute was designed to police the return which all security holders obtain from reorganization plans. The net return cannot be kept under supervision if private arrangements expressed in escrow agreements are to control. For the impact of excessive fee claims is the same whether they are charged directly against the estate or against the claim which represents a proportionate interest in the estate.

---

[9] Sen. Rep. No. 1916, *supra*, note 2, at 36, explains § 221 (4) as follows:

"Subsection (4) of section 221, derived from section 77B (f) (5), requires full disclosure and the approval by the judge of all payments for services, and for costs and expenses, in connection with the plan or the proceedings, whether such payments are made or promised by the debtor, or by any corporation succeeding to it, or by any other person."

Section 77B (f) (5) provided that "the judge shall confirm the plan if satisfied that . . . (5) all amounts to be paid by the debtor or by any corporation or corporations acquiring the debtor's assets, and all amounts to be paid to committees or reorganization managers, whether or not by the debtor or any such corporation for services or expenses incident to the reorganization, have been fully disclosed and are reasonable, or are to be subject to the approval of the judge . . . ." 48 Stat. 919.

Nor is it an answer to say that state courts can supervise allowances of this nature if the bankruptcy court is disallowed authority to do so. The happenstance of litigation in the state courts is not the equivalent of the administrative rule adopted by Congress when it asked that committee claimants submit their requests to the bankruptcy court. The incidence of fees on reorganization plans is so great that control over them is deemed indispensable to the court's determination whether the plan should be confirmed. Section 221 (4) provides, indeed, one of the standards by which the court makes that determination. Since the determination of allowances has been made an integral part of the process of confirmation which is exclusively entrusted to the bankruptcy court, we cannot infer that it may be delegated to a state court. Moreover, it is the bankruptcy court that is in the best position to know what work was done by the fee claimant, how important and involved it was, how much it benefited the whole group of security holders and how much it benefited the one class alone, how much of it was necessary, how much of it was effective. That court has already determined what the estate should pay. The question that remains is how much of a charge should be made against the escrowed stock and whether the state court or the bankruptcy court should determine what that charge should be. Certainly where, as in this case, the services benefited in part the estate and in part one class of security holders, it is the bankruptcy court that is in the position to weigh the interrelated issues of fact and make a fair allocation between the two.

These practical considerations support the literal reading of § 221 (4) that it is the bankruptcy court that has jurisdiction to pass on these fees. Its jurisdiction is therefore exclusive. See *Brown* v. *Gerdes, supra.*

Petitioners did not appeal from the order of the District Court holding that it had no jurisdiction over these

claims. But no reason is apparent why the petitioners may not apply to the District Court for an allowance even at this date. We were advised during the course of argument that the final decree under § 228 has not been .entered.[10] Yet though it has been, there is no reason in view of the special circumstances of this case why application cannot be made at the foot of the decree.

*Affirmed.*

MR. JUSTICE JACKSON, dissenting in part.

I agree with the opinion of the Court insofar as it holds that a committee of stockholders constituted under the Bankruptcy Act may not disburse or commit fiduciary funds in its own hands under general deposit agreement, nor funds of the estate, to pay attorneys' fees except as allowed by the federal court, and a contract to pay more from such funds would not be enforceable. But the opinion goes beyond that. As to agreements between stockholders and counsel which do not affect funds of the estate or of the committee, I see no reason to say that such contracts are subject to control by the Bankruptcy Court, or indeed, that in such a case as this, that there is any practical way in which the Bankruptcy Court can effectively assert such a jurisdiction as the opinion bestows upon it.

---

[10] Section 228 provides:

"Upon the consummation of the plan, the judge shall enter a final decree—

"(1) discharging the debtor from all its debts and liabilities and terminating all rights and interests of stockholders of the debtor, except as provided in the plan or in the order confirming the plan or in the order directing or authorizing the transfer or retention of property;

"(2) discharging the trustee, if any;

"(3) making such provisions by way of injunction or otherwise as may be equitable; and

"(4) closing the estate."

It seems to me that the Court is converting a provision of the Bankruptcy Act designed to prevent lawyers from overreaching stockholders into an authority for stockholders to swindle lawyers. It may appear like an instance of man biting dog, but the case before us is actually one of client snaring lawyer. The Court's opinion is a rather abstract declaration and my difficulty with it can be understood only from fuller recital of the facts.

This case has not been tried nor even been at issue. It was decided on motion to dismiss in the trial and intermediate appellate courts of New York State. All that was before the New York Court of Appeals was a certified abstract question to which I think it returned a correct abstract answer. But that question was not the only or the basic question presented by the case.

From a record that is unsatisfactory for decision of issues so important to the bar and to those interested in reorganizations, the following facts appear.

Pittsburgh Terminal Coal Corporation, as debtor, was in reorganization under Chapter X of the Bankruptcy Act. Three of these defendants, in a manner and with powers and duties not disclosed, became a "Committee for Preferred Stockholders." Whether any stock was deposited with them as such does not appear and the Committee seems to have represented only the interests of a family group, heavily interested in preferred stock, which comprised and dominated the Committee. The Committee originally retained these lawyers.

The situation appears to have been one of those in which existence of any estate, and hence of any value to the preferred stock, depended upon the outcome of a lawsuit for "uncovering mismanagement and malfeasance." Remuneration for the lawyers who were to press the suit was contingent upon their creating an estate; but in such cases courts are properly reluctant after the event

to include in allowances, compensation for the risk of doing much work for nothing.

These lawyers faced so slim a chance of fair compensation that they proposed to withdraw. To induce them to continue, four individual stockholders put 20% of their preferred stock in escrow with the defendant Committee under a separate written contract. This stock does not appear to have been previously deposited with the Committee, nor was it deposited at this time under the general stockholders' agreement but only under the special escrow agreement. The agreement with the lawyers recited, "This Committee has secured these shares from the stockholders listed above for the purpose of affording to you additional compensation for your services in the above matter. They have been obtained and are held in escrow on the condition that they be delivered to you only at such time as the reorganization proceedings" are terminated and final settlement of claims made, and delivery was conditioned on faithful and satisfactory service by the lawyers.

After an estate was created by the efforts of the lawyers, the stockholders repudiated the agreement and contended that counsel's services were only compensable from the estate without resort to the escrow contract. The attorneys thereupon sought compensation by an allowance from the estate. Judge Gibson's final opinion on the application recites facts among which are the following:

The chairman of the Committee for Preferred Stockholders, "while not denying that claimants had rendered services which could not be charged against the Debtor, and which were rendered at a time when any such compensation from the debtor's estate seemed improbable, asserted that the deposit of stock in escrow was to be effective only in case no considerable award should be made from the debtor's estate." He indicates that the mismanagement litigation was "the source of the

ultimate fortunate recovery of the fund for distribution."
But he finds "that the claimants rendered services *to the
preferred stockholders named in the escrow agreement*
which were not compensable from the fund distributed by
order of the court. Among such services were those ren-
dered in connection with the sinking fund claims, Gutt-
man's criticism of the Trustee's sales of machinery and his
management of the real estate, his rent collections and
the repair of the debtor's houses and other property."

The Debtor, the Committee and the Securities and
Exchange Commission joined and "contended that in a
Chapter X proceeding the court has the duty of deter-
mining the reasonableness of all fees, whether compen-
sable fees chargeable to the estate or for those which
are non-compensable and which cannot be so charged."
But Judge Gibson held otherwise and I think very prop-
erly concluded, "In the instant case no sufficient fund
has been credited to the depositing stockholders against
which any allowance to claimants could be charged.
*The judgment, if any were entered, would be directly
against the stockholders."* [All emphasis supplied.]
This he thought "seems to stretch the interpretative
powers of the court too far."

Thus denied compensation on a *quantum meruit* basis
for services admittedly rendered for and of value to these
stockholders, and the Bankruptcy Court holding itself
without jurisdiction to enforce their contract, these law-
yers then went into the courts of the State of New York
to enforce it. They named members of the Committee
as such as defendants. This was quite proper, for it
was the "Committee" which, as escrow agent, held the
stock in question. The complaint asked judgment that
the Committee deliver up the property of which it was
stakeholder but asked no judgment against the Commit-
tee that would be payable from any other fund or prop-
erty in its hands. The suit also made parties defendant

the individual preferred stockholders in whose behalf the agreement was made and who became parties to it individually by putting up their stocks and against whom Judge Gibson held he had no power in the bankruptcy proceeding to enter judgment. This action is thus against both individuals and the Committee.

However, the question which was certified to the Court of Appeals, and which is all that we took for review on certiorari to that court, ignores any question of individual liability and only asks, "Has the Supreme Court of the State of New York jurisdiction over the subject matter of this action to recover for legal services rendered to the stockholders committee which are not compensable out of the assets of the Debtor's estate, in a Chapter X reorganization proceeding under the United States Bankruptcy Act?"

Read literally, I agree that the answer to that abstract question is "No." A committee organized under the Act is a fiduciary whose commitments are made subject to the supervision of the court. I do not think it can undertake, out of its trust funds or out of stocks deposited only under the general agreement provided for by the Act, to pay for services that are beyond the power of the court to supervise.

But this Court, if I read aright, holds that no contract between any person and a lawyer for services in a reorganization proceeding can fix the basis or amount of the fee even if such fees are not payable out of the estate or out of any funds in the court's control, because "The statute was designed to police the return which all security holders obtain from reorganization plans. The net return cannot be kept under supervision if private arrangements expressed in escrow agreements are to control."

I had not understood that the Bankruptcy Act in reorganization cases disables anybody, even if a stock-

holder, from employing his own lawyer on such terms as he sees fit to fix by contract or that it disables lawyers from accepting such retainers. To invalidate them, so far as compensation is concerned, is the effect and, as I understand it, the intent of this decision. If one privately may retain a lawyer, I know of no reason why he may not fix his fee, contingent or otherwise, and secure the promised compensation by pledge of stock in the company being reorganized, or pay the fee in such stock.

I am unaware of any public interests protected by this denial of the right to hire one's own counsel for a fixed or determinable fee in such cases. The good served by court supervision in preventing lawyer raids on fiduciary funds is not advanced by this ruling. These shares were put up by individual stockholders, presumably mentally competent adults, in what proved to be a good bargain, even if they have to perform it, and a windfall if they do not. Are people situated as they were to be disabled from agreeing upon a fee that will induce counsel to expose mismanagement of the bankrupt or the trustee in cases where, as here, the chances of compensation otherwise are doubtful?

This Court seems to recognize unfairness in the situation it is creating and suggests that it may be remedied by a new application for larger fees to the Bankruptcy Court. But we do not tell the court what to do with the new application nor where it went wrong as to the former one. Indeed, we could not tell it of its mistake, if any, for we have only scattered bits of information about the evidence on which the previous order was made. If we would but put ourselves in the position of that court, I think it will at once appear how impractical is today's decision.

Judge Gibson apparently agreed that the services *for which either the estate or the Committee, as such, should pay* are adequately compensated by the allowance of

$37,500.   The reason he did not allow more was that services above that value were performed for neither the estate nor the Committee but for the individual stockholders who employed and agreed to pay the lawyers. Do we, without seeing the record, reverse this finding? If so, do we hold that the services Judge Gibson enumerated as not rendered for benefit of the estate or the Committee were rendered for one or the other instead of for the individuals?   Or do we say that, even if such services were rendered to individuals, the estate should pay for them?   From what fund is the additional compensation we are suggesting to be paid?   Would not other parties in interest have a just grievance if the estate of the bankrupt is burdened with paying for extra-estate services?   And what other fund is there in reach of the court's order?

What we seem to be saying is that an Act whose purpose is to give the Bankruptcy Court ample powers to see that no improper fees are charged on the estate really compels it to make the estate pay fees of lawyers for private parties in connection with reorganization.   I cannot follow this.

But if we do not mean they shall be paid from the estate or the Committee, Judge Gibson has already pointed out that there is no other fund.   Can this Court say he is wrong and that we know of one?   It is suggested that the Bankruptcy Court may make an allowance to counsel for the individual services and charge them against the escrowed stock.   I am not aware of anything which gives the Bankruptcy Court power to adjudicate the controversy, which is essentially a contract action between the individual stockholders and their lawyers, merely because the services involved appearing in the reorganization case.   Clearly the Court is holding that the contract is not valid insofar as it fixed the fee.   Is it then valid as basis for allowing some fee, but invalid as to the one agreed upon?   If on *quantum meruit* basis

the allowed fee exceeds the present value of the stock, may the Bankruptcy Court grant a personal judgment for the deficiency? If not, the contract is good to limit the lawyer's fee but not good to assure payment of it. And if valuable services have been rendered under the contract for which an allowance might otherwise be proper, should it be denied if other conditions of the contract are not fulfilled?

I am unable to find any basis in law for saying that the Bankruptcy Court has anything whatever to do with a private contract to employ and pay a lawyer to guard personal interests in a reorganization case, unless it is sought to charge the fee against the estate, or against stock deposited under a general agreement with the Committee formed under the Act. This situation involves neither, but only stock specially placed in a stakeholder's hands under the escrow contract with counsel.

An experienced and able District Judge knew all the facts and we do not. The lawyers involved made a complete disclosure, as should any lawyer who applies to the court for an allowance. Judge Gibson approved the fees so fixed that the estate paid its share and only its share, which seems to fulfill the purposes of the Federal Act.

But he set apart certain items of services for which he made no allowance because they were rendered for private parties. Those parties had a contract as to what, under the peculiar circumstances, should be paid for those services. Judge Gibson left the controversy as to that contract to the state courts to adjudicate. An action has been brought to require delivery of the stock put in escrow by the individuals to compensate their lawyers. The action seeks no money judgment and no relief that would affect or could affect the estate in the hands of the Bankruptcy Court.

I should remand the case to the courts of New York for such further proceedings as state law provides for

its adjudication and not inconsistent with our holding that fiduciary funds cannot be committed except by the Bankruptcy Court.

THE CHIEF JUSTICE and MR. JUSTICE FRANKFURTER join in this opinion.