In the Matter of HAMILTON HARD-WARE CO., INC., a/k/a Pro Mart of Milan, Inc., a Michigan Corporation, Debtor.

Bankruptcy No. 80–04032–B.

United States Bankruptcy Court,
E. D. Michigan.

May 20, 1981.

August, Thompson, Sherr, Clarke & Schafer, P.C. by Irving A. August, Birmingham, Mich., for debtor.

## OPINION

GEORGE BRODY, Bankruptcy Judge.

This involves the consideration of an application for fees filed by counsel for the debtor in a chapter 11 proceeding.

Hamilton Hardware Co., Inc., a/k/a Pro Mart of Milan, Inc., a Michigan corporation (the "debtor"), filed a voluntary chapter 11 petition on July 21, 1980. The filing of the petition was apparently triggered by a breach of contract action instituted by Bostwick-Braun Company ("Bostwick") in the United States District Court for the Eastern District of Michigan, against the debtor, to recover approximately $291,000.00 for goods sold to the debtor.

The debtor filed a plan on September 16, 1980. The plan provided that all creditors, other than Bostwick, were to be paid in cash upon confirmation of the plan. Bostwick was to be paid in accordance with an agreed-upon schedule. The plan was confirmed on October 24, 1980. Counsel for

the debtor filed an application for compensation. The application stated that he had received a retainer of $5,500.00 and requested an additional award of $10,000.00. Based upon the time record submitted, the hourly rate is in excess of $300.00. At the hearing scheduled to consider counsel's application, the court indicated the compensation requested appeared to be excessive. Counsel requested an opportunity to submit additional documentation in support of the application. The court granted this request and adjourned the compensation hearing. Additional documentation was not submitted but, at the adjourned hearing, counsel did make an oral statement in justification of the fee request.

Under the Bankruptcy Act of 1898, as amended, attorney fees were allowable as an expense of administration. § 62. The amount to be allowed was left to the sound discretion of the court. *In the Matter of Urban American Development Co.*, 2 B.C.D. 474 (S.D.Iowa 1976). This discretion, however, was to be reasonably exercised. Courts were not at liberty to indulge in the luxury of "vicarious generosity" by awarding more than a fair and reasonable fee. *York International Building, Inc. v. Chaney*, 527 F.2d 1061 (9th Cir. 1975), *reh'g den.* 1976; *In re Owl Drug Co.*, 16 F.Supp. 139 (Nev.1936), *aff'd Cohn v. Edler*, 90 F.2d 823 (9th Cir. 1937). Depletion of estates, as a result of unreasonable compensation demands and awards, has been a constant source of concern in bankruptcy cases. "Extravagant costs of administration in the winding up of estates in bankruptcy have been denounced as crying evils." *Realty Associates Securities Corp. v. O'Connor*, 295 U.S. 295, 299, 55 S.Ct. 663, 665, 79 L.Ed. 1446 (1935). Courts were, therefore, admonished that the aim of economy of administration was always to be borne in mind in exercising its discretion in fixing compensation. *In re Owl Drug Co., supra.* The criteria developed to enable the court to evaluate fee applications to accommodate the competing concerns of reasonableness and economy of administration is succinctly set forth in *In re Owl Drug Co., supra*, viz.:

"So, the test of reasonableness and the aim of economy of administration are always borne in mind in determining the amount. And in applying them certain criteria are allowed which are a modification of the usual ones adopted by court decisions and by the ethics of the profession in determining the value of all legal services. They are: The time spent, the intricacy of problems involved, the size of the estate, the opposition met, the results achieved—all subject to the economical spirit of the Bankruptcy Act. . . ." At p. 142. See also *Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir. 1958), and cases cited on p. 329, *infra.*

The award of compensation under the Bankruptcy Reform Act of 1978 is governed by section 330, which provides that the court may award to certain specified individuals, including the attorney for the debtor:

"(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional person employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title. . . ."

Prior to the adoption of the Bankruptcy Code, the House and Senate each drafted their own versions of a proposed Act. Both versions contained a proposed section 330, similar in content to that which was ultimately adopted. However, the legislative history accompanying each version differed.

The Senate did not intend to change existing law. The Senate comments to section 330, state:

"The reference to 'the cost of comparable services' in a nonbankruptcy case is not intended as a change of existing law. In a bankruptcy case fees are not a matter for private agreement. There is inherent a 'public interest' that 'must be considered in awarding fees,' *Massachusetts Mutual Life Insurance Co. v. Brock*, 405

F.2d 429, 432 (C.A.5, 1968), cert. denied, 395 U.S. 906 [89 S.Ct. 1748, 23 L.Ed.2d 220] (1969). An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be 'generous enough to encourage' lawyers and others to render the necessary and exacting services that bankruptcy cases often require. *In re Yale Express System, Inc.,* 366 F.Supp. 1376, 1381 (S.D.N.Y.1973). The rates for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection (a) is a point of reference, not a controlling determinant of what shall be allowed in bankruptcy cases.

"One of the major reforms in 1938, especially for reorganization cases, was centralized control over fees in the bankruptcy courts. See *Brown v. Gerdes,* 321 U.S. 178, 182–184 [64 S.Ct. 487, 489–490, 88 L.Ed. 659] (1944); *Leiman v. Guttman,* 336 U.S. 1, 4–9 [69 S.Ct. 371, 372–375, 93 L.Ed. 453] (1949). It was intended to guard against a recurrence of 'the many sordid chapters' in the history of fees in corporate reorganizations.' *Dickinson Industrial Site, Inc. v. Cowan,* 309 U.S. 382, 388 [60 S.Ct. 595, 599, 84 L.Ed. 819] (1940)...."

In contrast, the House legislative history indicated that section 330 was intended to change existing law by eliminating the principle of economy of administration as a factor to be considered by the courts in determining a compensation award. The legislative history, in pertinent part, states:

"... The compensation is to be reasonable, for actual necessary services rendered, based on the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case under the bankruptcy code. The effect of the last provisions is to overrule *In re Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817 (9th Cir. 1976, as amended 1977), which set an arbitrary limit on fees payable...."

Section 330, as enacted, adopts the House approach. The legislative history accompanying section 330 makes it clear that:

"Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code."

▪ Section 330, in effect, adopts the criteria established for fixing fees under the Bankruptcy Act, except that economy of administration is no longer a factor to be considered. Thus, as under the Bankruptcy Act, the compensation awarded must be for actual and necessary services, and must not exceed that which is reasonable. And, in determining what is reasonable, the court must consider the time, the nature, the extent and the value of such actual and necessary services, and the cost of comparable services.

▪ Counsel argues that the court must award the fee he has requested since no objections to his request were filed. This argument, whenever raised, has been firmly rejected. The burden of establishing the reasonableness of a fee rests upon the party making the request. The court has a duty, regardless of whether or not objections are filed, to determine whether the compensation requested is or is not reasonable. *York International Building, Inc., supra, reh'g den.* 1976. See also *In re Detroit International Bridge,* 111 F.2d 235 (6th Cir. 1940); *In the Matter of Interstate Stores, Inc.,* 437 F.Supp. 14 (S.D.N.Y.1977); *In the Matter of Dole Co.,* 244 F.Supp. 751 (N.D. Me.1965); *In re Kentucky Electric Power Corp.,* 11 F.Supp. 528 (W.D.Ky.1935); *In the Matter of Piedmont Development and Investment Corporation,* 3 B.C.D. 97 (N.D. Ga.1976); *In the Matter of Urban American Development Co., supra.* Such holdings reflect the clear mandate of section 330 of the Bankruptcy Code, and its predecessors, section 62 of the Bankruptcy Act and Rule 219 of the Rules of Bankruptcy Procedure—a mandate grounded in reality. Seldom are objections lodged to fee requests. *In re Kentucky Electric Power Corp., supra.* A debtor, harassed by creditors and envisioning the ultimate demise of his business, in desperation files a chapter 11 proceeding.

With the aid of his attorney, he is able to submit a plan which creditors accept and which is confirmed by the court. Not only is the debtor in no position to make an objective judgment as to the value of the legal services involved, but he also has no inclination to object to whatever fee is requested by the attorney who has made it possible for him to continue in business. Attorneys for creditors' committees all too often sacrifice the rights of their clients and violate their duty as court-appointed officers on the altar of self-interest. The knowledge that voiced objections may invite retaliation, suffices to secure their acquiescence to fee requests, no matter how patently excessive.[1] And creditors without representation are, for many obvious reasons, unable to lodge any effective and meaningful objections. Thus, the ultimate responsibility to assure that fees do not exceed the bounds of reasonableness rests, as it must, with the court.

■ Every attempt to determine a reasonable fee must at least begin with a consideration of the hours of service expended by counsel.

"... an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result. The number of hours of work will automatically reflect the 'time and labor involved,' 'the novelty and difficulty of the question,' and 'preclusion of other employment.' The attorney's normal hourly billing rate will reflect 'the skill requisite to perform the legal services properly,' 'the customary fee,' and the 'experience, reputation and ability of the attorney.'" *Northcross v. Board of Ed. of Memphis City Schools,* 611 F.2d 624, 642 (6th Cir. 1979).[2]

Counsel's time record reflects that he devoted 45½ hours to resolving the debtor's legal problems. However, the court records reveal that counsel, in addition to the time itemized in his application, attended two confirmation hearings: a 15-minute hearing on October 14, 1979, and a 20-minute hearing on October 29, 1979. The court, in determining the reasonableness of counsel's request, will take such time into consideration.

■ Accurate records should be kept of both the amount of time spent and the manner in which it was spent. *In re Meade Land & Development Co., Inc.,* 527 F.2d 280 (3d Cir. 1975); *In re Orbit Liquor Store,* 439 F.2d 1351 (5th Cir. 1971).

"... Adequate time records are essential to the court in carrying out its duty to determine how much work was productive or necessary, and how much work required treatment by experienced attorneys...." *Matter of Interstate Stores, Inc., supra,* at p. 16.

See also *In the Matter of Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817 (9th Cir. 1976); *In re Hudson & Manhattan Railroad Company,* 339 F.2d 114 (2nd Cir. 1964); *In re Leader International Industries, Inc.,* 2 B.C.D. 588 (E.D.Mich. 1976); *In re Astro-Matic Lubricare, Inc.,* 3 B.C.D. 233 (M.D.Tenn.1975).

The time record submitted by counsel does not meet the test of adequacy. The time record lists hours spent making and receiving telephone calls, writing and receiving letters, performing research, attending pretrial conferences, and meeting with creditors. There is no indication anywhere of the nature and substance of the telephone calls or letters; the matter researched and the result of the research are not disclosed; the pretrial references do not reveal the action in connection with which they were held, nor what was accomplished. The record is silent as to what was discussed or accomplished at the creditors' meeting.

---

**1.** The Bankruptcy Bar is a relatively closed society. The same attorneys generally appear in varying capacities in almost all substantial chapter 11 cases. Such continuing association fosters a club atmosphere which militates against effective client representation in matters relating to compensation. The court, thus, is faced with the difficult and delicate task of fixing fair and just compensation without the input of those who are in the best position to evaluate the fee request.

**2.** See *Matter of Martin Place Hospital,* 8 B.R. 770 (E.D.Mich.1981).

■ The time expended by counsel breaks down as follows: 50 telephone calls account for 12½ hours of the total time. The time record, as previously indicated, does not reveal the nature and substance of any of the calls. One-quarter hour of time has apparently been arbitrarily assigned to each call.[3] Five and three-quarters hours were spent in receiving and writing letters. An arbitrary time has also been assigned to both the sending and receiving of letters. The substance of the letters are not in any way identified. Three hours were spent doing research. The purpose and the result of the research are not disclosed. Approximately nine hours were spent meeting with the client and drafting admittedly routine pleadings and attending the section 341 meeting of creditors. Additionally, counsel claims two hours for travel to and from the bankruptcy court for a meeting with the bankruptcy judge. Counsel has a very active bankruptcy practice. He or a member of his firm is present in the bankruptcy court on a continuing basis. The purpose of the meeting was to make a simple inquiry—whether the court would waive the filing of the disclosure statement required by section 1125 of the Code. No special trip was necessary to make this inquiry. In fact, the inquiry could have been made by telephone.

These services were largely routine and ministerial. Such services should be compensated at a lower rate than truly legal services, irrespective of the experience and competency of the attorney who performs them.

"... within the purely legal classification, there are different classifications, having to do with relative difficulty, complexity and degree of legal applications, knowledge, experience, and/or intensity or persistence. For instance, litigation, research, preparation of settlements, agreements, documents, seem to this court to require a greater degree of legal

talents or specialization and to be of greater value to the estate than conferences with debtor's representatives and other parties, actions of pacification of creditors, letters and telephone responses to inquiries of parties in interest, reporting and informational services to creditors and the court, routine review of claims and supportive legal documents, and other routine, almost quasi or paralegal services performed, however, by the attorney for the trustee. Such latter type 'legal' services, likewise, should in the view of this court, carry a lower price-tag than the former type 'legal' services, although both are performed by the same attorney acting as attorney for the trustee." *In the Matter of Piedmont Development and Investment Corporation, supra,* at p. 101.

The remainder of the itemized time was spent attending pretrials and meetings of creditors. Six and one-half hours of pretrials are recorded: 4 hours on December 13, 1979, and 2½ hours on February 4, 1980. The pretrial conferences, apparently, were held in connection with the action instituted by Bostwick in the United States District Court for the Eastern District of Michigan. While a total of 6½ hours is recorded for the pretrial conferences, the actual time spent in conference was minimal—most of the recorded time was spent in traveling to and from the court.[4] The meetings which account for 6¾ hours of time, apparently, involved negotiations leading to the settlement of the lease and contract claims.

The only significant problems confronting counsel in this proceeding involved the settlement of a lease controversy and the contract action instituted by Bostwick to recover $291,000.00. Counsel contends that he was able to obtain settlements favorable to the debtor which enabled the debtor to survive—settlements that he was able to impose because of his singular negotiating

**3.** Based upon counsel's request, which exceeds $300.00 per hour, the charge for each call amounts to approximately $75.00.

**4.** Counsel apparently attended an additional pretrial conference, but the record does not

indicate its duration. The time record states that he spent 2 hours on March 3, 1980, writing two letters, attending a meeting, and attending a pretrial conference.

skill, and that this accomplishment justifies the fee request.

To evaluate this contention, it is necessary to review the settlements and the climate within which they were negotiated.

The debtor was leasing property from an entity called Grueber Food Town (the "lessor"). The debtor was approximately $20,000.00 in arrears on its lease payments. It no longer had any use for the leased property. The lessor agreed to cancel the lease and to take $4,000.00 in settlement of its claim. The Bostwick contract action was settled upon the following terms: The debtor agreed to pay Bostwick $275,000.00 at the rate of $2,000.00 per month. In addition, Bostwick agreed to discharge a debt of $135,000.00 which the debtor owed to the National Bank and Trust Company of Ann Arbor and which Bostwick had guaranteed.

Substantially all of the personal property of the debtor was subject to a security interest held by the National Bank and Trust Company of Ann Arbor (the "Bank") to secure a debt in the amount of $135,000.00.[5] Counsel for the debtor has conceded that the debtor had no equity in its property.[6] This concession is embodied in the following statement:

> "... we evolved a plan of arrangement under which the debtor who had no equity in this business and who owed considerably more than was secured by the assets, were booked for, let alone could be sold for at liquidation...." (Tr. 8)[7]

It is in this context that the settlement negotiations must be evaluated. The lessor's claim was unsecured. Since the debtor had no equity in its property, in the event of liquidation, the lessor would have had a substantial but uncollectible claim. By virtue of the settlement agreement, the lessor obtained immediate possession of its property with an opportunity to put it to productive use and, in addition, received $4,000.00 in cash. The reason for the lessor's acceptance of the offer of settlement is obvious.

Bostwick was in no better position. Since its contract claim was an unsecured claim, in the event of liquidation, it, too, would have had a substantial but uncollectible claim. By virtue of the settlement, Bostwick may ultimately realize $140,000.00 ($275,000.00 [the payments due under the plan], less the $135,000.00 paid to the Bank, for a total of $140,000.00). In addition, it would retain its preferred stock interest in the debtor which it held at the time of filing of the petition—an interest that would have been worthless if the debtor were liquidated.[8]

At the hearing on the fee application, counsel stated that Bostwick had a security interest in real property in which the debtor had $100,000.00 equity. The schedules disclose that the debtor held real property, but indicates that its equity was merely $20,000.00. In addition, the schedules do not reflect that Bostwick had a security interest in this property. However, even if it be assumed that Bostwick had a valid security interest in the debtor's real property, the interest of Bostwick was still better served by the acceptance of the settlement rather than by compelling the liquidation of the debtor. It would still receive $40,000.00 in excess of the value of any interest it may have had in the debtor's real property. Presumably, it also would retain any security interest it held in that property to secure the payments due under the plan.

It is clear that the financial condition of the debtor severely limited the options available to both the lessor and Bostwick.

---

5. See Tr., p. 6, and ¶ 12 of the complaint filed by Bostwick against the debtor in the United States District Court.

6. This fact was undoubtedly pressed upon the creditors during the settlement conference.

7. No purpose would be served in reviewing in detail the schedules filed by the debtor. They contain glaring inaccuracies. They fail to disclose the principal unsecured creditor, Bostwick, and the principal secured creditor, National Bank and Trust Company of Ann Arbor. The schedules also are in conflict with the statements made by counsel at the fee hearing on January 13, 1981, and are internally inconsistent.

8. The stock interest is disclosed in ¶ 21 of the statement of affairs.

Both were better served by accepting the debtor's offer, rather than by compelling the liquidation of the debtor. Novel or complicated issues were not involved. The settlements were routine matters for an attorney with a commercial practice. Economic reality and not special skills dictated the terms of settlement.

 Confirmation of a chapter 11 case is merely a step in the rehabilitation process. The fact that a plan has been confirmed does not offer any assurance that the debtor will ultimately be successful.[9] The opportunity given to a debtor by chapter 11 to work out his financial problems should not be jeopardized by requiring him to pay excessive costs of administration. *In the Matter of Dole Co., supra.* Courts "must ever be alert lest a reorganization inure to the benefit, not of the distressed debtor and the creditors but only to those engaged in saving it." *Pennish v. Herz,* 81 F.2d 511, 512 (7th Cir. 1936).

An attorney is entitled to reasonable compensation for services rendered. He is entitled to nothing more.

> "... [T]he dignity and honor of the profession are not conserved, or its influence for good promoted, by excessive allowance for service. That would lend countenance to the suggestion, sometimes heard, that the commercial spirit of the age has invaded even the legal profession, to the impairment of its dignity, the blunting of its sense of honor; that a profession instituted for the maintenance of justice has become degenerate, and that its main calling now is a vulgar scramble for the 'almighty dollar.' ..."
> *In re Kentucky Electric Power Corp., supra,* at p. 531.

 Awarding compensation is a delicate and difficult process. Determining the hours of service rendered and the establishment of an hourly rate is merely a step in that process. The nature of the services performed, the manner in which they were performed, the opposition encountered and the results obtained, must also be considered. The retainer received by counsel exceeds $100.00 per hour. For the reasons set forth in this opinion, this court concludes that the retainer reasonably compensates counsel for the legal services rendered. The application for additional fees is denied.[10]

---

**9.** A study completed by the Brookings Institution found that "... only ⅓ of the debtors were still operating their own business two years after their chapter XI proceedings were closed." Bankruptcy: Problem-Process-Re- form, by David T. Stanley and Marjorie Girth (1971).

**10.** To the extent that the transcript indicates a different result, it is in error.