**In re WHET, INC., Debtor.**

**Bankruptcy No. 80–1542–HL.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 13, 1983.

Anthony R. Martin-Trigona, pro se.

Jon D. Schneider, Goodwin, Proctor & Hoar, Boston, Mass., for trustee of WHET, Inc.

David Ferrari, trustee.

## MEMORANDUM ON ADMINISTRATIVE CLAIM.

HAROLD LAVIEN, Bankruptcy Judge.

The trustee's objection to the administrative claim of Anthony R. Martin-Trigona was heard by this Court on July 15, 1983. As a threshold issue, Mr. Martin-Trigona questions this Court's jurisdiction to decide his administrative claim. Mr. Martin-Trigona has recently filed a Chapter 13 petition in New York, which is in addition to a Chapter 7 in Connecticut filed on December 2, 1980. Aside from the question of the validity of his Chapter 13 filing, *see In re Cowen,* 29 B.R. 888 and 10 B.C.D. 738 (Bkrtcy.S.D.Ohio 1983). Mr. Martin-Trigona misconstrues the automatic stay. 11 U.S.C. § 362 stays actions *against* the debtor, not actions *by* the debtor. *In re Ideal Roofing & Sheet Metal Works, Inc.,* 9 B.R. 2 (Bkrtcy.S.D.Fla.1980). In this Chapter 11,

Mr. Martin-Trigona has taken the position of a plaintiff seeking a share of the estate's assets.

■ Additionally, 28 U.S.C. § 1471 gives this Court exclusive jurisdiction of the debtor's property and original jurisdiction of any claims against the debtor.

■ Finally, it is an accepted rule of comity that between courts of equal jurisdiction that the first to assert jurisdiction maintains it. *See Farmer's Loan and Trust Co. v. Lake Street Elevated R.R. Co.,* 177 U.S. 51, 61, 20 S.Ct. 564, 568, 44 L.Ed. 667 (1900); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 675 F.2d 1169, 1174 (11th Cir.1982). Note that this concept is applied in the venue provisions. Former Bankruptcy Rule 116(c) and Bankruptcy Rule 1014(b).

As to the merits of the administrative claim, although this Court has discussed the facts of this case on several occasions, a brief review of the facts is appropriate.

Mr. Martin-Trigona purchased all of the stock and became the chief officer of the debtor on April 28, 1978. Subsequently, he entered into a management contract between himself, individually, and himself as an officer. Mr. Martin-Trigona assigned his rights under this contract to others.

The debtor experienced various difficulties and on August 6, 1980, a state court receiver was appointed. On August 15, 1980, the debtor filed a voluntary Chapter 11 petition in New York. Two days after that filing, while incarcerated in the Metropolitan Correctional Center of Chicago, Illinois,[1] Mr. Martin-Trigona entered into a second management contract with himself. On September 4, 1980, this Chapter 11 was transferred from New York to Boston. A trustee was appointed on September 9, 1980. At least subsequent to the trustee's appointment, Mr. Martin-Trigona performed no services under this second management contract. Indeed, Mr. Martin-Trigona was in federal custody during the entire period of the trustee's operation of the radio station.

The trustee never formally rejected the second management contract. According to the trustee, he did not see a copy of the contract until the summer of 1983, well after the sale of the station. Further, Mr. Martin-Trigona admitted in an August 15, 1983 filing that he himself only discovered the originally signed contract in papers received from his former attorneys on "June 24th or 23rd," 1983. In any case, the trustee did not seek Mr. Martin-Trigona's services and, indeed, he took active steps to prevent Mr. Martin-Trigona from participating in the management of the radio station. For his part, Mr. Martin-Trigona contends that he was always willing to perform and could have done so despite his physical absence. I believe that Mr. Martin-Trigona sincerely thinks that he could have managed the station and performed better than the trustee. The trustee did not share this view and considering the rapid build up of vitriolic accusations, it is self-evident that the trustee and Mr. Martin-Trigona could not work together.

Mr. Martin-Trigona contends that as the result of a telephone conversation with the trustee in mid-October, 1980, the trustee was advised of the claim that Mr. Martin-Trigona had rights under a management contract.

On July 1, 1981, this Court approved the private sale of the operating assets and

---

1. Specifically:
   On July 22, 1980, Martin-Trigona was found in contempt of court in an unrelated civil case pending in the Northern District and ordered committed to jail as a recalcitrant witness. *See Martin-Trigona v. Gouletas* 634 F.2d 354 (7th Cir.) *cert. denied,* 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980), in which we affirmed the contempt order. On July 29, 1980, the order of confinement was modified to permit Martin-Trigona's immedi-

ate release between 6:00 a.m. and 9:00 p.m. to prepare for the mail fraud trial. He was ordered completely released from August 3 until the end of the trial.

. . . . .

The jury was impaneled and trial commenced on August 4, 1980 and continued for three weeks.
*United States v. Martin-Trigona,* 684 F.2d 485, 489 (7th Cir.1982)

broadcasting license of the debtor to Action Corporation for $1,250,001.50. *In re WHET, Inc.,* 12 B.R. 743 (Bkrtcy.Mass. 1981). The trustee completed the sale to Acton Corporation on July 2, 1982 and took no further role in the station's operations.

The second management contract is dated August 17, 1980. Although Mr. Martin-Trigona has filed a steady stream of papers including several other claims, he did not file this claim until January 3, 1983, when he sent the following cryptic telegram:

Please file this telegram under In re WHET, Inc. 80–1542–HL The debtor hereby objects to the plan and disclosure statement filed by the trustee. Anthony R. Martin-Trigona hereby submits a claim for priority administrative expense in the amount of $290,000 from August 1980–December 1982 as per books and records of debtor 11 USCA 503 507. Memorandum in support of objections and priorify [sic] claim to follow

Anthony R. Martin-Trigona and WHET, Inc. jointly and severely [sic].

Although the timing and form of Mr. Martin-Trigona's proof of claim is certainly questionable, it is not fatal if the claim is otherwise well-founded.

The original management contract was apparently the manner chosen by Mr. Martin-Trigona to compensate himself rather than take an officer's salary. This was his privilege, at least before bankruptcy. The present management contract was not in the debtor's files nor made available to the trustee nor the Court until nearly three years after its execution by Mr. Martin-Trigona, individually, and with himself as an officer of WHET, Inc. Further, Mr. Martin-Trigona was in a most unlikely location for one claiming a management role in a crisis beset Chapter 11 debtor. This was clearly the ultimate insider transaction which would require the closest court scrutiny. The words articulated by Chief Justice Taft in a case involving a contract that was concealed from the Court are particularly relevant:

The contract is contrary to public policy—plainly so. What is struck at in the refusal to enforce contracts of this kind is not only actual evil results but their tendency to evil in other cases. Even if the ultimate results in the management of the . . . estate were good, that could be no excuse for a contract plainly illegal, because tending to produce the recognized abuses which follow fraud and disloyalty by agents and trustees. Enforcement of such contracts when actual evil does not follow would destroy the safeguards of the law and lessen the prevention of abuses.

*Weil v. Neary,* 278 U.S. 160, 173–74, 49 S.Ct. 144, 149–50, 73 L.Ed. 243 (1929); *see also, Woods v. City National Bank and Trust Co. of Chicago,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed.820 (1941); *In re Arlan's Department Stores, Inc.,* 615 F.2d 925 (2d Cir.1979); *In re Lucille's Inc.,* 26 F.Supp. 943 (D.Me. 1939); 3A Collier on Bankruptcy, ¶ 62.05 (14th Ed.1978).

Had Mr. Martin-Trigona been functioning on the premises when the Chapter 11 petition was first filed or when the trustee was appointed, an inquiry by the trustee would have been made as to duties and compensation and some eventual consideration by the trustee would have been necessary. Mr. Martin-Trigona was not present and the tax returns, alerting the trustee to the first agreement, would only lull the trustee into finding that any reference, during the mid-October telephone conversation, referred to the prefiling agreement under which no present services were being performed. However, there are other problems with this claim.

Administrative expenses are defined by the Bankruptcy Code as:

the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case. . . .

11 U.S.C. § 503(b)(1)(A); *see also,* 11 U.S.C. §§ 330(a)(1), 503(b)(2); 503(b)(4). Administrative expenses must be approved by the bankruptcy court after a notice and hearing. 11 U.S.C. § 503(b). The purpose of mandatory court approval of administrative

claims is to provide the bankruptcy court with centralized control over fees, *Brown v. Gerdes,* 321 U.S. 178, 182–184, 64 S.Ct. 487, 489–490, 88 L.Ed. 659 (1944); and to guard against a recurrence of "the many sordid chapters" in "the history of fees in corporate reorganizations." *Dickinson Industrial Site, Inc. v. Cowan,* 309 U.S. 382, 388, 60 S.Ct. 595, 599, 84 L.Ed. 819 (1940). Specifically,

> The aim of the expanded controls over reorganization fees and expenses is clear. The practice had been to fix them by private arrangement outside of court.... This gave rise to serious abuses. There was the spectacle of fiduciaries fixing the worth of their own services and exacting fees which often had no relation to the value of services rendered.

*Leiman v. Guttman,* 336 U.S. 1, 6–7, 69 S.Ct. 371, 373–374, 93 L.Ed. 453 (1949) (footnotes omitted); *see also,* S.Rep. No. 95–989, 95th Cong. 40–41, 2d Sess. (1978), U.S.Code Cong. & Admin.News, p. 5787.

■ Mr. Martin-Trigona did not render management services during the trustee's operation of the radio station. Regardless of why, Mr. Martin-Trigona was not asked to provide services and, in fact, was actively prevented by the trustee from participating in any way in the operation of the station. Compensation, as an administrative expense, can only be awarded for *actual* services. 11 U.S.C. 330(a)(1), § 503(b)(1)(A). Indeed, Mr. Martin-Trigona's activities, as they related to the operation of the station and its sale, added to the expense of the trustee's management and did not benefit the estate. Not only have his actions added to the legal costs, but the delay he occasioned in the transfer of the license extended the time the trustee was compelled to operate the station at a substantial loss. Therefore the management contract, even if it is otherwise valid and could be considered breached by the trustee, would not qualify as an administrative claim because no actual management services were rendered in the operation of the station.

■ Since Mr. Martin-Trigona's claim might be considered to include an unsecured non-priority claim for breach of the management contract, the validity of the contract must be considered. The contract was hardly an armslength transaction—it was executed between Mr. Martin-Trigona, individually, and himself as an officer of the debtor and executed two days after the Chapter 11 filing. Mr. Martin-Trigona himself, was unable to produce a copy of the signed contract until mid-June of this year. Except for disputed telephone conversations, it is not clear that anyone was aware of the contract until Mr. Martin-Trigona's proof of claim was filed earlier this year. As noted above, private insider transactions must be scrutinized closely by the Court. Debtor contracts must be beneficial to the estate. To apply a less strict standard of review would leave the door open to the most egregious self-dealing at the expense of all creditors. The words of the Supreme Court, in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) are particularly relevant:

> [T]he bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director or stockholder.

*Id.* at 308, 60 S.Ct. at 246. Furthermore, the Court held that a fiduciary is a

> dominant or controlling stockholder or group of stockholders. *Southern Pacific Co. v. Bogert,* 250 U.S. 483, 492 [39 S.Ct. 533, 537, 63 L.Ed. 1099]. Their powers are powers in trust. *See, Jackson v. Ludeling,* 21 Wall. 616, 624 [88 U.S. 616, 22 L.Ed. 492]. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590 [41 S.Ct. 209, 65 L.Ed. 425].

*Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 245; *see also, Leiman v. Guttman,* 336 U.S. 1, 69 S.Ct. 371, 93 L.Ed. 453 (1949); *Dickinson Industrial Site, Inc. v. Cowan,* 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 (1940); *Weil v. Neary,* 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243 (1929); *In re Club Development & Management Corp.,* 27 B.R. 610 (Bkrtcy. App. 9th Cir.1982).

Moreover, the management contract was signed on August 17, 1980, two days after the bankruptcy petition was filed. 11 U.S.C. § 327 requires court approval for the employment of professional person by the estate. No court approval was sought.[2] Although the management contract contemplated Mr. Martin-Trigona's services as general manager—a service that normally would not be termed as professional, the contract also provided for Mr. Martin-Trigona to direct and instruct staff members, attorneys, and counsel for the company in the bankruptcy case and for him to participate in the bankruptcy proceedings and other related litigation. These services approach the professional, conflict with the duties of a trustee, and directly affect the administration of the estate—matters of sufficient concern to the Court to warrant court approval. That is particularly true due to the context of timing, secrecy, self-dealing and inside nature of this agreement.

■ Further, the contract itself may be invalid. The contract provides that "[no] minimum number of hours shall be required to be provided by" Mr. Martin-Trigona. Mr. Martin-Trigona, therefore, was under no obligation to perform. A contract lacking such an obligation may be considered indefinite, *Varney v. Ditmars,* 217 N.Y. 223,

111 N.E. 822 (1916), or illusory, *Chiapparelli v. Baker, Kellogg & Co.,* 252 N.Y. 192, 169 N.E. 274 (1929). The second management contract was merely an attempt by Mr. Martin-Trigona to assure himself of a claim for compensation regardless of the outcome of the Chapter 11 and despite his then confinement in federal prison.

Furthermore, had the management contract been presented to the Court at an appropriate time, the Court would have been wary of approving the management contract for some of the same reasons a trustee was appointed—the need for someone who could be available to handle all the pressing problems requiring on the scene attention, and the fact of conviction and federal imprisonment, *See In re WHET, Inc.,* 12 B.R. 743, 745 (Bkrtcy.Mass.1981). Now, of course, with the benefit of hindsight, we know that the conviction was reversed. The validity of the conviction, however, was not for this Court to determine. Mr. Martin-Trigona continues to insist that he could have managed the station by telephone and letter, which he equates to other successful absentee management. Although there are those who succeed despite obstacles, these must be considered the exception rather than the rule. For example, Abraham Lincoln may have taught himself to read and write by the fireplace in his log cabin, yet we do not utilize such methods in modern education. Examples of success, in spite of obstacles, may prove it is not impossible but cannot, under all of the circumstances of a Chapter 11, be the recommended course.

The management contract would, therefore, not only fail to provide a basis for an

---

**2.** This Court has made itself clear in this regard:

> Professional services performed for a bankruptcy estate are compensable out of the assets of the estate only if such professional assistance has been authorized by the Court prior to the services being rendered.

*In re Morton Shoe Co.,* 22 B.R. 449, 450 (Bkrtcy.Mass.1982); *In re Garland Corp.,* 8 B.R. 826, 828 (Bkrtcy.Mass.1981); *see also, In re J.M. Wells, Inc.,* 575 F.2d 329 (1st Cir.1978); *In re American Express Warehousing, Ltd.,* 525 F.2d 1012 (2nd Cir.1975); 2 Collier on Bank-

ruptcy 327.02 (15th Ed.1983). Although there is recent authority that nunc pro tunc compensation is permissible in rare or exceptional circumstances, *In re Triangle Chemicals, Inc.,* 697 F.2d 1280, 1289 (5th Cir.1983), Mr. Martin-Trigona has not alleged any such circumstances. Indeed, if Mr. Martin-Trigona had alleged that his imprisonment prohibited court approval, he would have been in the contradictory position of indirectly suggesting that these same circumstances prevented his performance under the contract.

administrative claim but also for a non-priority claim.

It should be pointed out that even arguendo, if the Court were to accept the validity of this management contract and the failure of the trustee to formally reject it, any breach would have occurred before December 2, 1980, the date of Mr. Martin-Trigona's filing of personal bankruptcy. Because of the appointment of the WHET, Inc. trustee and the actions of the trustee directed against any participation in management by Mr. Martin-Trigona in October, 1980, any action for breach of contract would have accrued before December, 1980. *See Equitable Trust Co. v. Western Pac. Ry. Co.*, 244 F. 485 (S.D.N.Y.1917), *aff'd*, 250 F. 327 (2nd Cir.1918), *cert. denied* 246 U.S. 672, 38 S.Ct. 423, 62 L.Ed. 932; *Parker v. Russell*, 133 Mass. 74 (1882). Therefore, any cause of action would belong to his Chapter 7 estate, originally converted from a Chapter 11 and presently being administered by a trustee in Connecticut. *See Dallas Cabana, Inc. v. Hyatt Corp.*, 441 F.2d 865 (5th Cir.1971); *St. Paul Fire & Marine Ins. Co. v. U.S.*, 525 F.Supp. 880 (C.I.T.1981).

■ Mr. Martin-Trigona also argues that he has a right to compensation based upon his recent activities in this court by testifying in opposition to various claims which

has resulted in a savings to the estate. This Court notes that Mr. Martin-Trigona has been instrumental in reducing the claims of several creditors. Further, he has, on occasion, conducted himself as a skillful and artful litigator. However, he has not been appointed as trustee and, as a non-member of the bar, the Court could not have appointed him as trustee's counsel. It is basic bankruptcy law that no one can force themselves into the administration of a bankruptcy estate. *In re American Express Warehousing, Ltd.*, 525 F.2d 1012 (2nd Cir. 1975); *In re Sapphire Steamship Lines, Inc.*, 509 F.2d 1242 (2nd Cir.1975).[3] No matter how much benefit is conferred upon the estate, volunteers cannot seek compensation for administrative expense. *In re Photon*, 26 B.R. 693, 698 (Bkrtcy.Mass.1982).

For the reason hereinbefore set forth, the administrative claim of Mr. Anthony R. Martin-Trigona is DENIED.

---

**3.** In *In re Sapphire Steamship Lines, Inc.*, at issue was the efforts of the creditors and their counsel, who opposed a court approved settlement of $1,600,000. Because of their efforts, the settlement offer was increased to $2,000,-000 and later to $2,473,070. The Court ruled that counsel could not be compensated for their efforts because they did not possess the requisite court approval. 509 F.2d at 1246. In *In re American Express Warehousing, Ltd.*, a creditor's counsel solely opposed the payment of legal fees that totalled $800,000. Although successful, the Court denied the creditor's counsel any fees as it had failed to seek prior court approval. 525 F.2d at 1016.

The Court is not unmindful that, in the special circumstance of counsel objecting successfully to the fee application of a trustee and his counsel, a court may waive prior court approval. *See In re Sapphire Steamship Lines, Inc.*, 509 F.2d 1242 at 1246 (2nd Cir.1975); *In re New York Investors*, 130 F.2d 90, 92 (2nd Cir. 1942). There is no question that Mr. Martin-Trigona has led the charge. However, it should be noted that before Martin-Trigona com-

menced his cross-examination, the Court indicated that an extensive cross-examination might not be necessary since the Court was thinking in terms of as much as a 75% reduction of the fee claimed by the trustee as an accountant. Since fees have not been awarded and may not be awarded for some time because of Mr. Martin-Trigona's activities, any consideration of that aspect of his administrative fee application is premature. An even more troubling question is the status of the claimant. To the extent that Mr. Martin-Trigona claims to represent the residual debtor corporation as an officer, distinguished from either the debtor's trustee or Mr. Martin-Trigona's personal trustee, Mr. Martin-Trigona's services are for his own personal benefit. Moreover, because of his status as a non-lawyer, he cannot claim compensation for the practice of law. Under these circumstances, even if this Court were to determine that Mr. Martin-Trigona's cross-examination had a direct and substantial effect on the Court's final fee determinations, Mr. Martin-Trigona might well be limited to necessary and reasonable expenses.