RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0010P (6th Cir.)
File Name: 04a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: BIG RIVERS ELECTRIC CORPORATION,

*Debtor.*

Nos. 02-6212/ 6213/6338/6340/ 6341/6344/6347

UNITED STATES OF AMERICA, On Behalf of the Rural Utilities Service of the Department of Agriculture and the United States Trustee, et al.,

*Appellees,*

*v.*

J. BAXTER SCHILLING,

*Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
Nos. 99-00177; 99-00117; 99-00118; 99-00119; 99-00131;
99-00147; 01-00049—Joseph H. McKinley, Jr.;
Avern Cohn, District Judges.

Argued: September 10, 2003

Decided and Filed: January 8, 2004

Before: GIBBONS and SUTTON, Circuit Judges; MILLS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Donald L. Cox, LYNCH, COX, GILMAN & MAHAN, Louisville, Kentucky, for Appellant. Michael E. Robinson, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., for Appellees. Michael A. Fiorella, SULLIVAN, MOUNTJOY, STAINBACK & MILLER, Owensboro, Kentucky, for Debtor. **ON BRIEF:** Donald L. Cox, LYNCH, COX, GILMAN & MAHAN, Louisville, Kentucky, for Appellant. Michael E. Robinson, William Kanter, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., Alan C. Stout, STOUT LAW OFFICE, Marion, Kentucky, for Appellees. Michael A. Fiorella, James M. Miller, SULLIVAN, MOUNTJOY, STAINBACK & MILLER, Owensboro, Kentucky, for Debtor.

_____

## OPINION

_____

SUTTON, Circuit Judge. At issue in this case are the duties of disinterest and disclosure of an examiner appointed to facilitate a reorganization under Chapter 11 of the Bankruptcy Code. The issues arise from the appointment of J. Baxter Schilling to serve as the examiner in the reorganization of Big Rivers Electric Corporation, which was unable to meet obligations on $1.2 billion in debt and whose

_____

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

September 1996 bankruptcy petition represented the largest Chapter 11 case filed in Kentucky history.

As an examiner, Schilling did much to advance the successful reorganization of Big Rivers, which emerged from Chapter 11 in June 1997 through a consensual plan of reorganization approved by the bankruptcy court. During his tenure as examiner, however, Schilling sought privately to negotiate a success fee with three of the estate's unsecured creditors, by which they would pay him a percentage of their increased recovery on top of the hourly fee authorized by the bankruptcy court for his services. Schilling did not disclose the negotiations, or the agreements he believed he had reached with these creditors, to the debtor in possession, to the other creditors or to the court until many months later. When Schilling's conduct came to light, several parties objected to his actions, as did the United States Trustee which is responsible for appointing bankruptcy examiners and trustees. In view of his conduct, they argued that Schilling and his law firm should disgorge all of the fees dispensed to them during the case—totaling nearly $1 million. The district court agreed, and we now affirm.

I.

Unable to meet the continuing obligations on more than $1.2 billion in debt, the Big Rivers Electric Corporation filed a petition to reorganize the company under Chapter 11 of the Bankruptcy Code and to remain as a debtor in possession during the reorganization. Filed on September 26, 1996, the petition represented the largest bankruptcy case ever filed in Kentucky and at the time was one of the largest bankruptcy cases in the country. A publicly-regulated utility, Big Rivers owed $1.1 billion of its debt to the Rural Utilities Service of the United States Department of Agriculture (the "Utilities Service"), which held a perfected security interest in all of Big Rivers' assets. *See In re Big Rivers Elec. Corp.*, 284 B.R. 580, 584 (W.D. Ky. 2002). Big Rivers' largest other creditors

included Bank of New York, Chase Manhattan Bank, and Mapco Equities, each of which held unsecured claims. *Id.*

On October 7, 1996, Bluegrass Containment, Inc., a smaller unsecured creditor, moved the bankruptcy court to appoint a trustee or an examiner in the Big Rivers case. *Id.* In a Chapter 11 case, a trustee replaces the debtor in possession and takes immediate control of the business and the reorganization effort. *See* 11 U.S.C. §§ 1104(a), 1106(a). Examiners, by contrast, assume a more limited role. They typically investigate the debtor's business and handle other duties specifically assigned by the bankruptcy court, but do not replace the debtor in possession in handling the day-to-day affairs of the business. *See id.* §§ 1104(c), 1106(b).

The bankruptcy court decided that an examiner should be appointed and ordered the United States Trustee to select one. In addition to the tasks expressly required of examiners under the Bankruptcy Code—investigating the debtor's affairs and filing a report, *see id.* § 1106(b)—the bankruptcy court ordered the examiner to "[w]ork with Big Rivers and its creditors in . . . resolving various disputes with creditors, . . . and [] if feasible, attempt to negotiate a global settlement of the disputes in this case and the development of a consensual plan of reorganization." JA 81. The court did not specify the terms of the examiner's compensation.

The United States Trustee selected J. Baxter Schilling, a Kentucky bankruptcy practitioner, as the examiner. At the time of his appointment, Schilling had frequently served as a Chapter 7 trustee, had twice served as a Chapter 11 trustee, but had never served as an examiner. On October 18, 1996, the bankruptcy court entered an order approving Schilling's selection but again did not specify the terms of the examiner's compensation. 284 B.R. at 585.

Soon after his selection, Schilling signed a document entitled "Affidavit of Examiner that He is Disinterested," in

which he attested that he was "a disinterested person in this case" and did not "have an interest materially adverse to the interest of the estate or of any class of creditors." *Id.* at 585–86. Schilling also submitted a separate verified statement that he had "no connections with the . . . Debtor, creditors, or any other interested parties." *Id.* at 586.

On October 31 and November 1, 1996, Schilling held meetings in Washington, D.C. with the major secured and unsecured creditors. In the course of the meetings, Schilling sought to mediate a dispute between the Utilities Service and some of the unsecured creditors regarding the priority of their claims so that the parties could submit a consensual plan of reorganization to the court. *Id.* at 586. When the initial negotiations did not bear fruit, Schilling reached the conclusion that the parties would never agree on a plan of reorganization unless someone found a way to bring new value into the estate. To that end, Schilling decided to undertake the task himself, performing in his words "trustee duties, *including the principal duty of a trustee to maximize the value of the debtor's estate*, as well as examiner duties." JA 499. Because he effectively would function as a trustee in this new role and because he customarily had received a percentage-based fee as a Chapter 7 trustee, Schilling believed he should be paid like a Chapter 7 trustee for his work as the examiner in the Big Rivers case. 284 B.R. at 586; *see also* JA 129 (Schilling: "I had been given the misnomer of examiner, but I had been given trustee duties"), 153–54, 164–65, 178–79.

Near the conclusion of these meetings—and at times when the Utilities Service's representatives were not in the room—Schilling discussed these views with some, but not all, of the unsecured creditors. Schilling initially told Chase and Bank of New York representatives that he wanted them to pay him a percentage fee based on the "success" he brought to the estate in the form of "new value." 284 B.R. at 586. Explaining what he meant by a "success fee," Schilling later

told Chase, Bank of New York and Mapco representatives that he expected each of them to pay him three percent of their increased recovery from Big Rivers. *Id.* Without such a deal, Schilling told Bank of New York's attorney, he would not perform his mediation duties. *Id.*

Schilling left the Washington meetings believing that, subject to bankruptcy court approval, Bank of New York, Chase and Mapco would pay him three percent of their increased recovery. As later communications reveal, however, none of these three creditors believed they had reached such an agreement with Schilling—at least not at that time. *Id.*

By November 13, 1996, the Utilities Service learned that Schilling had made statements about his desire to seek compensation based on the new value added to the estate. According to the bankruptcy court, "one or more interested persons," including the Utilities Service, spoke to a member of the bankruptcy court's staff the morning of November 13, 1996 and requested an *in camera* hearing regarding the examiner's compensation. *Id.* at 587. These "persons," unidentified except for the Utilities Service, expressed concern about Schilling's statements that he would seek compensation based upon new value added to the estate during his tenure. The bankruptcy judge instructed his staff member to tell the parties that they could raise the issue at a hearing if they wished, but that he would not hold an *in camera* hearing. No one raised the issue in court during the hearing on November 13, 1996. *Id.*

A few days later, on November 15, 1996, the bankruptcy court entered an order providing for Schilling's interim compensation. *Id.* With the Utilities Service's consent, the bankruptcy court allowed the examiner to receive interim compensation of $180 per hour in 1996 and $185 per hour in 1997, all of which Big Rivers would pay from its "cash collateral"—*i.e.*, cash in which the estate and another entity

(here, the Utilities Service) had an interest. *See* 11 U.S.C. § 363(a). The court's order did not alter Schilling's ongoing obligation to "compl[y] with all applicable provisions of the Bankruptcy Code." JA 148.

In the meantime, Schilling learned that Chase would not support his success-fee proposal. He called Chase and accused the company of "going behind his back and not being an honest dealer." 284 B.R. at 586. In response, Chase wrote Schilling a letter saying that he was incorrect and reaffirming its support for a success-fee arrangement. Chase asked Schilling "to keep this confidential," JA 160, and he complied.

On December 3, 1996, Schilling had a similar conversation with representatives from Bank of New York. Having heard that the Bank's local counsel had objected to the United States Trustee about Schilling's proposed success fee, Schilling called the Bank to inquire. The Bank's representatives assured Schilling that if local counsel had registered any such complaint, she had no authorization to do so. 284 B.R. at 587.

On January 22, 1997, Big Rivers filed its proposed plan of reorganization. The next day, according to Schilling, he sought and received the bankruptcy judge's approval to "begin to negotiate [his] percentage-based fee with the Banks [Chase and Bank of New York] and Mapco." *Id.* This conversation, to the extent it in fact took place, was *ex parte,* was off-the-record and was not the subject of discovery, and it did not include at any rate the court's approval to seek such a fee directly from the three creditors. *Id.* at 587–88.

The following day, January 24th, Schilling telephoned Bank of New York, Chase and Mapco to confirm his fee arrangements. And the following week, Schilling sent each of these creditors a letter to "confirm [their] telephone conversation" and to request written confirmation of the

agreement they had reached during the Washington meetings to pay him three percent of their increased recovery. JA 441–43 (Schilling's letter to Bank of New York); JA 436–38 (Schilling's letter to Chase); JA 439–40 (Schilling's letter to Mapco).

Schilling's letter to Chase stated that the bank and Schilling "had an oral agreement reached during the Washington conference that [Schilling] would receive compensation of 3% of the new value that Chase received in the case." "It is this figure of $835,335.00," the letter continued, "which was discussed [on the telephone] last Friday [January 24th] and which we agreed was reasonable compensation for the Examiner to receive from Chase at the closing of the plan." JA 436–37.

Schilling's letter to Mapco reflected a similar understanding. Schilling reported that Mapco's share of the three-percent fee amounted to $180,000 and added that he "agreed with the suggestion of [Chase's representative] that the payments from MAPCO and the Banks be deposited into an escrow account on the closing date under the plan." JA 439.

The letter to Bank of New York likewise asserted that Schilling and the Bank had reached an agreement in Washington. The Bank's success-fee obligation, Schilling reported, came to $589,665. In the letter Schilling added that the Bank had made this promise not only at the Washington meetings but also during a December 3, 1996 meeting between Schilling and the Bank's employees—proving that the parties had "two oral agreements." JA 441–42.

Bank of New York and Mapco responded with letters of their own, each denying that they had reached such an agreement. Bank of New York "strongly [took] issue with [Schilling's] continuous references to 'agreements' that ha[d] allegedly been reached between [Schilling] and [Bank of New

York] concerning compensation," JA 372, and reminded Schilling that "[it] is inappropriate [] for any court-appointed fiduciary to seek compensation directly from individual creditors." JA 373. Mapco insisted that it had "never previously approved or even considered any compensation agreement with [Schilling]," and that Schilling's compensation "would be determined by the Bankruptcy Court under the Bankruptcy Code." JA 452.

Chase took a different tack. In a phone call with Schilling in response to his letter, it acknowledged that Schilling and Chase had reached an oral agreement regarding a success fee, but said that they had struck the agreement during their January 24, 1997 telephone call, not during the Fall 1996 Washington meetings. 284 B.R. at 589. In the months after January 1997, Chase asked Schilling to take several positions adverse to the Utilities Service in the bankruptcy, at times doing legal research for the examiner to substantiate Chase's position. 284 B.R. at 591.

While Schilling and the three unsecured creditors engaged in a considerable number of communications about what agreement was reached and when the agreement occurred, one thing is clear: Neither Schilling nor these unsecured creditors initially disclosed any of these communications—the private discussions in Washington, the telephone calls, the letters—to the Utilities Service, to the United States Trustee, or to the other parties involved in the Big Rivers bankruptcy.

On March 26, 1997, Schilling filed his first interim fee application. In making bankruptcy fee applications, Bankruptcy Rule 2016(a) requires applicants, including examiners, to disclose "what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case." Fed. R. Bankr. P. 2016(a). In his application Schilling included a "Rule 2016(a) Disclosure Statement," asserting that he was a "disinterested person" and did not "represent or

hold an interest adverse to the interests of the estate with respect to the matters about which the Examiner was appointed." 284 B.R. at 589–90. He did not, however, mention (1) his agreement with Chase or (2) the agreement that he believed he had reached with Bank of New York and Mapco. *Id.*

On June 5, 1997, Schilling filed a "Request For Payment of Administrative Expenses," which explained to the bankruptcy court that he might seek $4.41 million in compensation based on new value he had brought into the estate. 284 B.R. at 590–91. He also filed a proof of claim for an amount not to exceed $4.41 million. *Id.* at 591. While these documents disclosed Schilling's plan to seek percentage-based compensation, they nowhere disclosed his agreement with Chase or his alleged agreements with Bank of New York and Mapco to have the fee paid directly by them. *Id.*

A few days later, on June 9, 1997, the bankruptcy court confirmed Big Rivers' consensual plan of reorganization. *Id.* As Schilling had earlier predicted, new value enabled the parties to develop a consensual plan of reorganization. In contrast to the plan initially proposed by Big Rivers, the approved plan included an additional $147 million in new value for the creditors.

No one denies that Schilling played a significant role in the negotiations leading to the approved plan. Most significantly, Schilling supported the auctioning of Big Rivers' assets and opposed accepting a pre-petition lease deal that Big Rivers had negotiated with PacificCorp Energy Company. Big Rivers and the Utilities Service opposed the auction. The bankruptcy court ultimately ordered an auction on the condition that the bidders compete with the PacificCorp agreement. Louisville Gas and Electric in the end submitted the highest bid, which added considerable value to the estate and which laid the groundwork for the consensual plan of

reorganization that the court eventually confirmed. 284 B.R. at 590 n.9.

On July 24, 1997, Schilling filed a second interim fee application. He again included a Rule 2016(a) disclosure disclaiming any improper interest. And he again failed to report the promise that Chase had made to him and the promises that he believed Bank of New York and Mapco had made to him.

The first *written* confirmation of an agreement between Schilling and one of the creditors came in the form of a letter from Chase to Schilling dated July 31, 1997. JA 291–92. In the letter, Chase "confirm[ed]" its support for Schilling's application for a three-percent fee enhancement and, subject to bankruptcy court approval, formally agreed to be responsible for up to $835,335 of the fee enhancement. *Id.*

Schilling filed the Chase letter with the bankruptcy court the same day. He attached it to a pleading entitled "Preliminary Pleading Regarding Application for Allowance of Compensation and Reimbursement of Expenses," in which Schilling noted: (1) "[a]s previously stated in pleadings, and as disclosed to the Court," Bank of New York, Chase and Mapco agreed during the Washington meetings to a percentage-based approach, and (2) "the [Utilities Service] stated, at that time, it would not agree or disagree with a percentage compensation to the Examiner." JA 288. Schilling further claimed that the court had "instructed the parties on July 1, 1997 to attempt to negotiate the Examiner's fee request," that "the Examiner has begun additional negotiations," but that "those negotiations have concluded only with Chase," as evidenced by the "agreement attached hereto." *Id.* This constituted the first public disclosure of Schilling's intention and efforts to have his percentage-based compensation paid by these three creditors as opposed to the estate. 284 B.R. at 591–92.

In response to the pleading, Mapco's attorney wrote privately to Schilling that the statement was "incorrect, at least as to my client." JA 456. Schilling persisted, claiming that the statement was "correct" and that all three creditors had agreed to his proposal. 284 B.R. at 592.

Spurred by the public disclosure of Schilling's agreement with Chase, the Utilities Service and the United States Trustee requested discovery into Schilling's fee arrangement. In view of the Chase agreement, the Utilities Service objected to the continued use of its cash collateral to pay Schilling and, along with the United States Trustee, asked the court to order Schilling to disgorge the fees he and his law firm had already received. The bankruptcy court rejected both requests and enjoined further court filings and discovery concerning the examiner's fees.

Not until one year later, in September 1998, did the bankruptcy court revisit the issue of Schilling's compensation. The court permitted the parties to submit pleadings on the examiner's fees, but continued a ban on discovery and refused to hear any evidence. At this point Schilling claimed for the first time, in open court, that he "ha[d] never said there was a side agreement with" Mapco. *Id.* at 592. Soon after Schilling made this statement, Mapco filed with the bankruptcy court copies of Schilling's earlier letters to the company in which he had insisted that they had reached such an agreement. Bank of New York also filed with the court a copy of its letter from Schilling asserting a similar agreement. *Id.* at 592–93.

Schilling filed his final fee application in October 1998, requesting approximately $4.41 million in compensation to "be paid by the debtor, various creditors of th[e] estate as the Court equitably determines is appropriate, or a combination thereof." JA 485. This figure combined Schilling's hourly fees (which totaled $530,928.74) with an enhancement of three percent of the new value brought into the estate during

Schilling's tenure as examiner (which came to $3,879,071.25).

On October 23, 1998, in response to this application, the United States Trustee filed a motion to disgorge all of Schilling's fees because he had improperly negotiated secret side agreements for his compensation. Schilling responded that he had never truly believed that he and Bank of New York, Chase and Mapco had reached such agreements and that his statements claiming otherwise were intentionally untrue. 284 B.R. at 593. As Schilling put it:

> A common tactic used in negotiations is to make a statement, *as if it were fact*, even though the statement is incorrect and is known to be incorrect. The Examiner used this common place tactic in his January, 1997 letters to Chase and counsel for Bank of New York and MAPCO, asserting, as a fact, that an agreement had been reached at the Washington settlement conference, wherein these creditors would pay the Examiner 3% on any new value their clients received.

JA 400.

Shortly thereafter, the bankruptcy judge disqualified himself from hearing the fee issues and transferred the case to another bankruptcy judge. The new judge continued the ban on discovery and without an evidentiary hearing issued a decision on Schilling's fee application, awarding Schilling $2,638,205—which covered his hourly compensation plus an enhancement of four times that amount—to be paid by Big Rivers. *In re Big Rivers Elec. Corp.*, 233 B.R. 754, 768 (Bankr. W.D. Ky. 1999). Big Rivers, the Utilities Service, the United States Trustee and Schilling each appealed this decision to the district court.

On appeal, the district court affirmed in part and reversed in part. It affirmed the bankruptcy court's order regarding

Schilling's base compensation, reversed the order granting Schilling an enhancement and remanded the case to the bankruptcy court to consider the disgorgement issue as an initial matter because the bankruptcy court had not reached the issue. *See In re Big Rivers Elec. Corp.*, 252 B.R. 676, 687–89 (W.D. Ky. 2000). Schilling appealed the decision to this Court, which dismissed the appeal for lack of jurisdiction. *See* 28 U.S.C. § 158(d) (granting the courts of appeals "jurisdiction of appeals from all final decisions" of district courts on appeal from bankruptcy courts); *IRS v. Hildebrand (In re Brown)*, 248 F.3d 484, 487 (6th Cir. 2001) ("[W]e are to inquire into the finality of [the district court's] decision[], not the finality of the bankruptcy court's decision.").

On March 8, 2001, the bankruptcy court, on remand, transferred the case to the district court asking it to consider whether to withdraw the order of reference. On March 25, 2001, the district court withdrew the order of reference, which meant that the district court rather than the bankruptcy court thereafter would have original jurisdiction over the case. When all of the district court judges in the Western District of Kentucky recused themselves from hearing the case, the Chief Judge of the Sixth Circuit assigned the case to Judge Avern Cohn of the Eastern District of Michigan.

On August 13, 2002, Judge Cohn granted the joint motion of the Utilities Service and the United States Trustee for disgorgement, granted Big Rivers' motion for partial disgorgement, and ordered Schilling and his counsel to disgorge all fees paid to them. 284 B.R. at 602. Based on detailed factual findings, the court held that Schilling was not entitled to any fees because he was not a "disinterested" examiner under 11 U.S.C. § 1104(d). As the court explained:

> The Bankruptcy Code and Rules mandate that a professional, such as an Examiner, be a neutral, disinterested party in the case. The moment that the Examiner approached three of Big Rivers' largest

unsecured creditors and broached the subject of his compensation, suggesting that they pay him a percentage-based fee based on the "success" or "new value" he brought them to the estate, he was no longer a disinterested party. Whether or not such an agreement was reached or whether an agreement was subject to the approval of the bankruptcy court is irrelevant. What is relevant is that the Examiner sought to have his compensation tied to the enhanced value brought to the estate and, in particular, tied to what [Bank of New York], Chase and Mapco received on their claims from the estate.

284 B.R. at 596. Recognizing that Schilling made it "known to all parties—including the government—that he was going to seek compensation in the amount of a percentage of the enhanced value he brought to the estate[,]" the district court explained that Schilling's "intention to have his compensation paid by [Bank of New York], Chase and Mapco was known only to [him] and these creditors." *Id.* at 597. This lack of disinterestedness, the district court concluded, meant that Schilling "was not a properly appointed professional and is therefore not entitled to any compensation." *Id.*

The court also held that Schilling failed to disclose his fee arrangements as required under 11 U.S.C. § 329 and Bankruptcy Rule 2016. Section 329(a) requires "[a]ny attorney representing a debtor" to disclose his fee arrangements. Rule 2016(a) applies broadly to any "entity seeking interim or final compensation" and requires disclosure of any "payments . . . made or promised to the applicant." The district court concluded that Schilling violated both provisions by failing to disclose his "fee discussions with Mapco, Chase, and [Bank of New York]." 284 B.R. at 599. The court did not credit Schilling's assertion that he "only reached an agreement with Chase [in July 1997] and it was immediately disclosed." *Id.* Schilling's "letters written in January of 1997 belie this assertion," the court

found: "It [was] only when the government questioned the Examiner's actions that the Examiner retreated from the position in his letters and made the assertion that his statements were intended for 'negotiation.'" *Id.* "Under these circumstances," the court concluded, "the only effective solution is to deny the Examiner, and his law firm, all compensation." 284 B.R. at 602. The court's order required Schilling—"individually and doing business as The Law Firm of J. Baxter Schilling"—to remit to Big Rivers $931,075.50, the amount that had already been dispensed to him and his firm throughout the case, plus interest. Schilling now appeals the district court's disgorgement order, requesting reinstatement of his hourly and enhanced fees.

## II.

Because the district court was exercising original rather than appellate jurisdiction when it ordered Schilling and his law firm to disgorge all compensation, we review its order for abuse of discretion. *See Michel v. Federated Dep't Stores, Inc. (In re Federated Dep't Stores, Inc.)*, 44 F.3d 1310, 1315 (6th Cir. 1995). In doing so, we adopt the district court's underlying factual findings unless clearly erroneous and we review its underlying construction of the Bankruptcy Code de novo. *Id.*

## A.

In considering the district court's resolution of these issues, we start with the statutory framework. In a typical Chapter 11 reorganization, the debtor remains in possession of and operates the business at the same time that it manages the reorganization effort. Less typically—when, for example, the debtor's management is guilty of fraud or gross mismanagement—a bankruptcy court orders the appointment of a trustee to replace the debtor in possession and to take control over the business and the reorganization effort. *See* 11 U.S.C. §§ 1104(a), 1106(a). The appointment of an

examiner, as happened here, straddles these options, as an examiner performs some of the functions of a trustee but does not replace the debtor and does not take on the day-to-day task of running the company. *See id.* §§ 1104(c), 1106(b).

The Bankruptcy Code expressly requires examiners to perform two duties normally required of trustees and authorizes the court to assign other duties as well. *Id.* § 1106(b). First, the Code requires examiners to perform an investigation, which means they must "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." *Id.* § 1106(a)(3). Second, the Code requires examiners to file a report, which means they must identify and memorialize "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." *Id.* § 1106(a)(4)(A). In addition to these mandatory duties, a bankruptcy court may order an examiner to perform "any other duties of the trustee that the court orders the debtor in possession not to perform." *Id.* § 1106(b).

Given the sensitivity of these tasks and the objectivity required to perform them, the Code requires all examiners, like all Chapter 11 trustees, to be "disinterested." *Id.* § 1104(d). A defined term, "disinterested person" means a person who:

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor . . . ;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

*Id.* § 101(14).

While examiners and trustees perform some of the same duties and while each of them must remain disinterested, the Code distinguishes examiners from trustees in other ways. In contrast to earlier practices, the Code now prohibits an examiner from serving as a trustee or as counsel for the trustee in order to ensure that examiners may not profit from the results of their work. *Compare* Bankruptcy Reform Act of 1978, §§ 321(b) ("A person that has served as an examiner in the case may not serve as trustee in the case."), 327(f) ("The trustee may not employ a person that has served as an examiner in the case.") *with* Bankruptcy Act of 1898, as amended, § 45, *reprinted in Collier on Bankruptcy* App. A pt. 3(a) (15th ed. rev. 2003) (including no such prohibition). *See* 124 Cong. Rec. H11,103 (daily ed. Sept. 28, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6473 ("In order to ensure that the examiner's report will be expeditious and fair, the examiner is precluded from serving as a trustee in the case or from representing a trustee if a trustee is appointed."); 124 Cong. Rec. S17,420 (daily ed. Oct. 6, 1978), *reprinted in* 1978

U.S.C.C.A.N. 6542; *Collier* ¶ 327.04[10] ("The purpose of section 327(f) is to ensure that examiners discharge their investigatory duties in a purely objective fashion."); Leonard L. Gumport, *The Bankruptcy Examiner*, 20 Cal. Bankr. J. 71, 152 (1992) ("In the interest of fairness to the subject of the investigation, Congress rejected the historical practice of permitting the examiner to profit from its report by becoming the trustee or an employee of the trustee.").

Nor may examiners play a role in a Chapter 7 proceeding. In a Chapter 7 liquidation, which occurs (among other times) at the end of an unsuccessful effort to reorganize a company under Chapter 11, a trustee always replaces the debtor in possession, and the Code prohibits the use of an examiner when a trustee has already been appointed. *Id.* § 1104(c). *See also* 11 U.S.C. § 1109(b) (giving a trustee, but not an examiner, the right to "raise and [] appear and be heard on any issue in a [Chapter 11] case"); *In re Baldwin United Corp.*, 46 B.R. 314, 316 (Bankr. S.D. Ohio 1985) ("An Examiner performs the investigative duties of a trustee, and may perform other trustee duties as the Court directs, but he stands on a different legal footing than a trustee."). These modest differences between trustees and examiners do not diminish an examiner's duties of disinterest but in fact serve to highlight them.

The Bankruptcy Code neither expects nor requires examiners to volunteer their time. Like other officers and professionals appointed in a Chapter 11 case, examiners may request "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A) & (B). Only "[a]fter notice to the parties in interest and the United States Trustee and a hearing," however, may "the court [] award" examiners these fees and expenses. *Id.* The bankruptcy court "may, on its own motion or on the motion of the United States Trustee . . . or any other party in interest, award compensation that is less than the amount of compensation that is requested." *Id.*

§ 330(a)(2). These same standards apply to interim compensation, which the Code also authorizes. *Id.* § 330(a)(5).

Rule 2016(a) of the Federal Rules of Bankruptcy Procedure provides additional details about the procedure that "[a]n entity," such as an examiner, "seeking interim or final compensation . . . from the estate" must follow. "An application for compensation," the Rule says, "shall include a statement as to what payments have theretofore been made or *promised* to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case" and "the source of the compensation so paid or promised." Fed. R. Bankr. P. 2016(a) (emphasis added).

### B.

In enumerating the duties of examiners and trustees, the drafters of the Code also invoked the more-generalized equitable duties applicable to these positions of trust. *See Young v. United States*, 535 U.S. 43, 53 (2002) ("[T]he Bankruptcy Code *incorporates* traditional equitable principles."). In defining the obligation of "disinterestedness," the Code says that examiners and trustees may "not have an *interest materially adverse to the interest of the estate or of any class of creditors or equity security holders*, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, *or for any other reason*." 11 U.S.C. § 101(14)(E) (emphasis added). The phrase "for any other reason" is not defined. By prohibiting any "materially adverse" "interest" to any party to the bankruptcy "for any . . . reason," Congress plainly invited—indeed compelled—federal courts to construe "disinterestedness" against the backdrop of the equitable duties that apply to positions of trust. *See In re Martin*, 817 F.2d 175, 181 (1st Cir. 1987) (acknowledging "that the Code is less than explicit in mapping the contours of the

disinterestedness requirement" and interpreting the requirement in a way that is "faithful to our view of Congress's intent and to the overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction") (quotation omitted); *cf. Cent. States Southeast & Southwest Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 & n.10 (1985) ("Congress invoked the common law of trusts to define the general scope of [fiduciaries'] authority and responsibility" by providing, for example, that "assets of an employee benefit plan shall be held in trust." ) (quotation omitted); *NLRB v. Amax Coal Co.*, 453 U.S. 322, 332–33 (1981) ("ERISA essentially codified [] strict fiduciary standards" by providing, for example, that a fiduciary "may not 'act in any transaction . . . on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.'") (quoting 29 U.S.C. § 1106(b)(2)).

By linking trustees and examiners in this respect—by making them equally obligated to remain "disinterested"—Congress also signaled that examiners must satisfy the unbending standards of fiduciary duty that the law and society long have come to expect of trustees in general and that the Supreme Court has required of bankruptcy trustees in particular. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (stating that a Chapter 11 trustee owes a "fiduciary duty . . . to shareholders as well as to creditors"); *Mosser v. Darrow*, 341 U.S. 267, 271 (1951) ("Equity tolerates in bankruptcy trustees no interest adverse to the trust."); *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268 (1941) ("Protective committees, as well as indenture trustees, are fiduciaries."); *In re Baldwin United Corp.*, 46 B.R. 314, 316 (S.D. Ohio 1985) ("An Examiner's legal status is unlike that of any other court-appointed officer which comes to mind. He is first and foremost disinterested and nonadversarial. The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders, but he answers solely to the

Court."); *In re Hamiel & Sons, Inc.*, 20 B.R. 830, 832 (Bankr. S.D. Ohio 1982) ("[T]he trustee or examiner [] constitutes a court fiduciary and is amenable to no other purpose or interested party."); *cf. Wolf v. Weinstein*, 372 U.S. 633, 650 (1963) ("If, therefore—as seems beyond dispute from the very terms of the statute—the trustee is himself a fiduciary within the meaning of [the statute], logic and consistency would certainly suggest that those who perform similar tasks and incur like obligations to the creditors and shareholders should not be treated differently under the statute for this purpose.").

Finally, the Code not only says that examiners and trustees must remain "disinterested," but it also says that they may receive only "reasonable compensation." 11 U.S.C. § 330(a)(1)(A). The compensation phrase, the Supreme Court has reasoned, suggests that trustees and examiners must remain loyal to all relevant parties in the bankruptcy and must act as fiduciaries in doing so. *See Wolf*, 372 U.S. at 642 ("[R]easonable compensation for services necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act.") (quotation omitted); *Woods*, 312 U.S. at 268–69 (the statutory term "reasonable compensation" requires "strict adherence to the[] equitable principles [that govern] the standard of conduct for fiduciaries").

In incorporating the equitable duties of trustees into the Bankruptcy Code and in applying them to bankruptcy trustees and examiners, Congress followed a well-trodden path. The National Legislature frequently legislates against the backdrop of common law and equitable principles, and the federal courts have often looked to these traditions in determining the contours of a trustee's or another fiduciary's duties. *See Young*, 535 U.S. at 53 ("[T]he Bankruptcy Code *incorporates* traditional equitable principles."); *Field v. Mans*, 516 U.S. 59, 69–70 (1995) ("[N]either the structure of § 523(a)(2) [of the Code] nor any explicit statement in

§ 523(a)(2)(A) reveals, let alone dictates, the particular level of reliance required by § 523(a)(2)(A), and there is no reason to doubt Congress's intent to adopt a common-law understanding of the terms it used."); *Cent. States*, 472 U.S. at 570 ("[R]ather than explicitly enumerating [in ERISA] *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility."); *Amax Coal Co.*, 453 U.S. at 330 ("Given this established rule against dual loyalties and Congress' use of terms long established in the courts of chancery, we must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary.").

When Congress enacted the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, which became the basis for modern bankruptcy law, it assuredly meant to incorporate similar common-law duties as the original Act nowhere defined, much less mentioned, a duty of disinterestedness or any equivalent concept. When Congress substantially modified the 1898 Act through the Chandler Amendments in 1938, ch. 575, 52 Stat. 840, it did the same thing in adopting a requirement of "disinterest," which was broadly defined as an "adverse interest" "for any reason." *See* Chandler Amendments of 1938, Pub. L. No. 75-696, § 158(4), 52 Stat. 840 (1938) ("A person shall not be deemed disinterested . . . if—it appears that he has . . . for any reason an interest materially adverse to the interests of any class of creditors or stockholders.") And in 1978, when the current Bankruptcy Code was adopted, Congress embraced a similar definition of "disinterest." *See* 11 U.S.C. § 101(14)(E) ("[D]isinterested person . . . does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to . . . the debtor . . . or for any other reason.").

In each of these forty-year increments—in 1898, in 1938, in 1978—Congress legislated against the backdrop of centuries of common-law decisions about the duties of trustees and other fiduciaries as well as against the backdrop of courts construing statutes in the context of similar common-law traditions. And in each instance, Congress incorporated these principles and traditions. *Cf. Wolf*, 372 U.S. at 641 ("[T]he purpose behind § 249 was to codify these decisions and to give pervasive effect in Chapter X proceedings to the historic maxim of equity that a fiduciary may not receive compensation for services tainted by disloyalty or conflict of interest.").

### C.

An examiner's duties in a bankruptcy proceeding, then, flow from the Code, the Federal Rules of Bankruptcy Procedure and the common law, including the once-distinct principles of equity. All of these sources considered, a bankruptcy examiner has three general duties. *First*, consistent with the statutory requirement of "disinterest," the examiner may not have a "material adverse" interest to any party to the bankruptcy "for any . . . reason," either at the time of appointment or during the course of the bankruptcy. *See In re Marvel Entm't Group*, 140 F.3d 463, 476 (3d Cir. 1998) ("A plain reading of this section suggests one is a 'disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy."); *Roger J. Au & Son, Inc. v. Aetna Ins. Co. ( In re Roger J. Au & Son, Inc.)*, 64 B.R. 600, 605 n.8 (N.D. Ohio 1986) (This section "appears broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code.") (quotation and citation omitted); *In re Watson*, 94 B.R. 111, 116 (Bankr. S.D. Ohio 1988) ("A disinterested person should be divested of any scintilla of personal interest which might be reflected in [that person's] decisions concerning estate matters.").

*Second*, consistent with the Federal Rules of Bankruptcy Procedure, examiners have several disclosure obligations. They must disclose all "payments . . . made or promised" to them, meaning they must disclose in all fee applications any understandings they believe they have reached with anyone regarding their compensation. *See Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 720 (6th Cir. 2001) ("An attorney in a bankruptcy case has an affirmative duty to disclose fully and completely all fee arrangements and payments."); *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 480 (6th Cir. 1996) ("[T]he fulfillment of the [disclosure] duties imposed under [the Code] are crucial to the administration and disposition of proceedings before bankruptcy courts."); *Neben & Starrett v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 880 (9th Cir. 1995) ("The disclosure rules impose upon attorneys an independent responsibility."); *In re BH&P Inc.*, 949 F.2d 1300, 1317–18 (3d Cir. 1991) (holding that a trustee "breache[s] the duty of disclosure" when he "contemplate[s] and discusse[s] a specific situation involving a potentiality for conflict" but fails to disclose it).

*Third*, consistent with the statutory requirement for receiving "reasonable compensation" and with the common-law standards of fiduciary duty, examiners owe the creditors and shareholders a duty of loyalty. In imposing this duty on examiners and trustees, bankruptcy law "seeks to avoid such delicate inquiries . . . into the conduct of its own appointees by exacting from them forbearance of all opportunities to advance self-interest." *Mosser v. Darrow*, 341 U.S. 267, 271 (1951). *See* G. Bogert, *Law of Trusts and Trustees* § 543 (rev. 2d ed. 2003) (trustees "must display throughout the administration of the [case] complete loyalty to the interests of [the creditors and shareholders] and must exclude all selfish interest"); *Collier* ¶ 1108.09[1] ("[A] chapter 11 trustee, like the trustee of a conventional personal trust, owes single-minded devotion to the interests of those on whose behalf the trustee acts.").

### III.

Schilling's conduct as an examiner in the Big Rivers bankruptcy failed to live up to these standards. *First*, he violated his duty to remain "disinterested." An agreement with a single creditor that links the examiner's compensation to the creditor's recovery qualifies as such an interest because it creates the risk that the examiner will favor one creditor at the expense of other creditors, to say nothing of all equity holders. Given the zero-sum realities of most bankruptcies, every dollar recovered by a favored creditor becomes a dollar lost to a disfavored creditor. Opportunities abound, moreover, for bankruptcy examiners paid in this manner to benefit selected creditor patrons. They might decline to investigate and report any "cause[s] of action available to the estate" against the favored creditor (say, for a fraudulent conveyance). *See* 11 U.S.C. § 1106(a)(4). They might file, or threaten to file, a report that harms a disfavored creditor unless it accepts a settlement that increases the recovery of a favored creditor. They might stall or obstruct confirmation of a plan that represents the best interests of the estate if it contains no recovery for the favored creditor (and no commission for the examiner).

Whether as a matter of fact an individual examiner chooses to do any of these things does not alter the "disinterestedness" inquiry. That self-interest *might* lead examiners to act in these ways suffices to disqualify them, because the Code does not merely prohibit trustees and examiners from *acting* upon materially adverse interests, it prohibits trustees and examiners from *having* them. *See Woods*, 312 U.S at 268 ("[T]he incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need not speculate as to whether the result of the conflict was to delay action where speed was essential, to close the record of past transactions where publicity and investigation were needed, to compromise claims by inattention where vigilant assertion was necessary, or

otherwise to dilute the undivided loyalty owed to those whom the claimant purported to represent. Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation."); *W.F. Dev. Corp. v. U.S. Trustee (In re W.F. Dev. Corp.)*, 905 F.2d 883, 884 (5th Cir. 1990) ("In a bankruptcy proceeding, limited and general partners do hold materially adverse positions."); *In re Crimson Inv.*, 109 B.R. 397, 402 (Bankr. D. Ariz. 1989) ("[B]y receiving compensation from Debtor's creditors, Debtor's counsel had, and has, a pecuniary interest materially adverse to the interest of the secured creditors and the interests of the estate—a conflict of interest that requires denial of all compensation.").

Schilling undeniably had such an agreement—an oral one—with Chase no later than January 24, 1997. Had Schilling reached such an agreement before his appointment, the bankruptcy court could not have allowed him to serve as a trustee or examiner because he would not have been disinterested. *See Michel*, 44 F.3d at 1319 (holding that the debtor's retention of a professional who was not disinterested, as required under the Code, was invalid from day one despite the bankruptcy court's approval based on equitable concerns). That Schilling reached the agreement in the midst of his examination and in secret only makes matters worse, especially in view of his affirmative statements to the court that he remained a "disinterested person" who did not "represent or hold an interest adverse to the interests of the estate." JA 300.

*Second*, Schilling violated his disclosure obligations. Each time Schilling filed an interim fee application, Rule 2016(a) required him to disclose "payments . . . made or promised" to him "for services rendered or to be rendered in any capacity whatsoever in connection with the case." Schilling's January 1997 oral agreement with Chase regarding his compensation constituted a "payment[]" "promised" within the meaning of the rule, whether or not the promise was subject to bankruptcy

court approval. Yet Schilling did not disclose the agreement in his March 1997 and July 1997 interim fee applications, each time in violation of the rule. *See Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 720 (6th Cir. 2001) ("An attorney in a bankruptcy case has an affirmative duty to disclose fully and completely all fee arrangements and payments."); *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 480 (6th Cir. 1996) ("[T]he fulfillment of the duties imposed under these provisions [§ 329 and Rule 2016] are crucial to the administration and disposition of proceedings before the bankruptcy courts."); *In re Crimson Inv.*, 109 B.R. at 402 ("[C]ounsel's failure to disclose forthrightly the source of all compensation should warrant the denial of all compensation.").

Rule 2016(a) also required Schilling to disclose the promises for payment that Schilling *believed* Bank of New York, Chase and Mapco had made to him at the Fall 1996 conference in Washington. When a court-appointed fiduciary believes a party has promised him payment, he may not use later disputes over the existence or enforceability of the promise to excuse an earlier failure to disclose it. *See In re BH&P Inc.*, 949 F.2d 1300, 1317–18 (3d Cir. 1991) (holding that a trustee who has "contemplated and discussed a specific situation involving a potentiality for conflict" has a duty to disclose it).

*Third*, Schilling violated his duty of loyalty—not just by entering into the oral agreement with Chase, but by misrepresenting his actions to the court and to the parties during his negotiations with the parties and during his efforts to backtrack from them. Schilling did so on multiple occasions: when he filed documents claiming to have no adverse interest; when he filed documents claiming to have received no promises for payment; when he claimed that he "never said there was a side agreement with [Mapco]," 284 B.R. at 592; and when he asserted in January 1997 letters to Bank of New York, Mapco and Chase that they had agreed at

the Washington conference to pay him a percentage of their recovery, only to claim later that these assertions were just a negotiation tactic—*i.e.*, a misrepresentation. Rather than serve all parties to the bankruptcy and rather than do so in a straightforward and transparent manner, Schilling sought compensation in a way that did none of these things. Hired to serve the estate's interests, he started down a path that served his own.

In each of these instances, it bears repeating, the issue was not whether Schilling would be compensated for his efforts. Absent violations of the Code and his fiduciary obligations, he would be, and indeed the court early on provided that he would be compensated at his standard hourly rate of $180 per hour in 1996 and $185 per hour in 1997. Perceiving an opportunity to be paid still more, however, Schilling negotiated, and in some instances consummated, compensation arrangements for his personal benefit (and ostensibly for the benefit of some creditors but not others). All the while, he did so secretively and outside of the traditional mechanisms for permitting fiduciaries to identify and pursue matters of self-interest—notice to all parties and a hearing before the court. Where the law demanded "[n]ot honesty alone, but the punctilio of an honor the most sensitive," *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, C.J.), and "forbearance of all opportunities to advance self interest," *Mosser*, 341 U.S. at 271, Schilling responded with too little honesty and too much self-interest. His conduct simply was not compatible with an examiner's, or for that matter a trustee's, duty of loyalty.

IV.

Having concluded that Schilling violated his duties to remain disinterested and loyal and having concluded that he violated his duty to disclose payments promised to him, we must consider whether the sanction imposed by the district court was appropriate. *Cf. Wolf*, 372 U.S. at 653 ("[T]he bare

holding that § 249 [of the Bankruptcy Act] has been violated does not automatically determine the consequences of such a violation."). Our role in this respect is a modest one, as "a bankruptcy court"—or, in this instance, a district court acting in its place—"is given a great deal of latitude in fashioning an appropriate sanction." *Mapother v. Mapother P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 478 (6th Cir. 1996). "[T]he []court's sanction," therefore, "should not be disturbed unless a clear abuse of discretion is found." *Id.*

No abuse of discretion occurred here. Because the Code permits only "reasonable compensation" and because that requirement "'necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act,'" *Wolf*, 372 U.S. at 642, "a fiduciary may not receive compensation for services tainted by disloyalty or conflict of interest," *id.* at 641. Absent "peculiar and unique circumstances," we thus have held, a court must deny all compensation when a party is not disinterested at the time of appointment. *See Michel*, 44 F.3d at 1319–20 (holding that the debtor's financial advisor—whom the Code required to be disinterested—was not disinterested, was not validly appointed, and therefore was not entitled to compensation, even though the financial advisor had fully disclosed its interest at the outset and even though the bankruptcy court had approved the appointment).

That Schilling breached these duties at some point *after* his appointment does not change matters. In *In re Downs* we held that a bankruptcy court abused its discretion by allowing a party to retain fees who had exhibited a "willful disregard" of Rule 2016 and of § 329 (requiring a debtor's attorney to report compensation arrangements) and who did so after an appointment. 103 F.3d at 479–80. The authority to decline all fees, we concluded, "is inherent, and in the face of such infractions should be wielded forcefully." *Id.* at 479. "Section 329 and Rule 2016 are fundamentally rooted in the fiduciary relationship between attorneys and the courts," and

"the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." *Id.* at 480. While *In re Downs* did not involve a "simple technical breach" of Rule 2016—the attorney there "acted affirmatively to conceal his fee arrangement" and "misled" the trustee and other creditors, *id.* at 479—neither does this case. *See Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994) ("[W]hen [a fiduciary] loses his disinterested status during the course of administering a bankrupt's estate . . . . the court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose. This approach is most in keeping with common law fiduciary principles and best serves the deterrence purpose of the rule.").

What is true of Schilling is also true of "The Law Firm of J. Baxter Schilling," the sole member of which is J. Baxter Schilling. JA 287. The district court did not abuse its discretion in concluding that, for these purposes, Schilling and his counsel (Schilling) were one and the same, and that Schilling's firm must also disgorge all fees. 284 B.R. at 583.

No doubt the sanction in this case is a harsh and unforgiving one. Schilling's efforts, he claims, brought approximately $145 million of new value into the estate. Rather than the thanks of a grateful court and the thanks of grateful parties, he received an order to reimburse the debtor nearly $1 million in fees. Steep as the sanction may be, it represents the price of disloyalty, a price the courts have not hesitated to charge in dealing with similar breaches of trust. Serving as an examiner, as with "trusteeship," "is serious business and is not to be undertaken lightly or so discharged." *Mosser*, 341 U.S. at 274. When it comes to loyalties and conflicts of interest, we do not ask whether harm has resulted, because "the[] effect is often difficult to trace." *Id.* at 273. "Where an actual conflict of interest exists, no more need be

shown in this type of case to support a denial of compensation." *Woods*, 312 U.S. at 268; *see Mosser*, 341 U.S. at 273 ("[E]quity has sought to limit difficult and delicate fact-finding tasks concerning its own trustee by precluding such [self-dealing] transactions for the reason that their effect is often difficult to trace, and the prohibition is not merely against injuring the estate—it is against profiting out of the position of trust."); *Ross v. Kirschenbaum (In re Beck Ind.)*, 605 F.2d 624, 636 (2d Cir. 1979) ("Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same.") (Friendly, J.).

Nor are examiners and trustees without recourse when these issues arise in the course of a bankruptcy. *Mosser*'s advice on the point remains as sound today as it was a half-century ago: "seek instructions from the court, given upon notice to creditors and interested parties." *Id.* at 274. When, for whatever reason, an examiner sees a legitimate need to serve some masters rather than others in a bankruptcy, and above all when one of the preferred masters is himself, the necessary condition for proceeding is full disclosure and court permission. Schilling instead chose secrecy and deception, a choice that properly cost him his fees.

## V.

Schilling makes several contentions to the contrary, all of which amount to variations on a few points and none of which is persuasive.

## A.

First and foremost, Schilling argues that merely *negotiating* a fee arrangement with creditors does not make an examiner improperly interested or disloyal. Appellant Br. at 38; Reply Br. at 1, 3, 7. Saving for later the question whether this argument has a mistaken factual premise—that until July

1997 Schilling merely negotiated with the three creditors and had not reached any fee agreement—we disagree with its legal premise.

As the district court properly concluded, the law does not allow a court-appointed fiduciary to engage in secret and self-interested negotiations so long as the parties stop short of a formal agreement. 284 B.R. at 597. An examiner violates the duty to remain disinterested and loyal no less by negotiating a fee in secrecy than by reaching a formal (but secret) agreement because the risks of partiality in each setting are equally grave, as this case well proves.

Schilling's conduct during the "negotiations" illustrates the point. When Schilling proposed a fee arrangement in secret to Bank of New York, Mapco and Chase at the Fall 1996 Washington conference, he threatened that he would not perform his mediation duties without such a deal. When a Chase representative denied that a deal existed, he accused Chase of not being an honest broker. In January 1997 Schilling sent letters to Bank of New York, Mapco and Chase—creditors of the estate to whom he owed a duty of loyalty—asserting that each of them had agreed at the Washington conference to pay him a percentage of their recovery. In an August 1997 letter to Mapco, Schilling continued to insist that he and the three creditors had reached a compensation agreement at the Washington conference. Schilling later claimed, at a September 1998 court hearing, that "he never said there was a side agreement with [Mapco]," 284 B.R. at 592, which led two of the creditors to disclose the January 1997 letters. Upon disclosure of the letters, Schilling changed his story again, claiming that what he had asserted in the January 1997 letters was intentionally untrue: "A common tactic used in negotiations," Schilling explained, "is to make a statement, *as if it were fact*, even though the statement is incorrect and is known to be incorrect. The Examiner used this common place tactic in his January, 1997 letters . . . asserting, as a fact, that an agreement had been

reached at the Washington settlement conference." *Cf.* Model Rules of Prof'l Conduct R. 4.1 ("In the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person."). On this record, Schilling cannot tenably show that his conduct during the negotiations was any more consistent with his duties of disinterest and loyalty than a formal compensation agreement would have been.

The core problem with Schilling's contrary position is his apparent view that he was just another party seeking to maximize his personal recovery, failing to realize that "many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties." *Meinhard*, 164 N.E. at 546. As every law student learns, fiduciaries are "held to something stricter than the morals of the market place," *id.,* a principle that appropriately applies to the sensitive duties of trustees and examiners. Whether or not other parties were permitted to negotiate in secret or to mislead each other in pursuit of a larger recovery, and whether or not Schilling was permitted to negotiate in secret for the estate's gain or to mislead the estate's creditors for the estate's gain, Schilling had no right to negotiate in secret or to mislead the estates's creditors *for his own gain.*

Nor is Schilling correct in arguing that this overlooks § 1129(a) of the Code, which provides that a court may not confirm a plan of reorganization unless "[a]ny payment made or to be made by the proponent, by the debtor, or by a person . . . acquiring property under the plan, for services or for costs and expenses in or in connection with the case . . . has been approved by, or is subject to the approval of, the court as reasonable." It is true that this section makes most fees incurred in a Chapter 11 case subject to court approval. And it is true that this section refers to court approval of fees that in some instances may be paid directly by creditors, indicating that creditors like Bank of New York, Chase and

Mapco may pay professionals' fees themselves (including, to use one obvious example, their own professionals' fees). Yet § 1129(a) does not, as Schilling argues, authorize an *examiner* to negotiate an agreement to share in a creditor's recovery so long as the agreement is ultimately subject to court approval. The provision by no means eliminates the examiner's duty to remain loyally disinterested and to comply with pertinent disclosure requirements at each stage of the case.

Neither *Leiman v. Guttman*, 336 U.S. 1 (1949), nor *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503 (5th Cir. 1998), comes to a different conclusion. *Leiman* stands for the general proposition that a bankruptcy court must approve all fee arrangements provided for in a plan of reorganization before confirming the plan. 336 U.S. at 8. And *In re Cajun* held that § 1129(a)(4) does not mandate pre-payment review of fees paid by individual creditors to a creditors' committee to compensate the committee for legal fees incurred in connection with the bankruptcy. 150 F.3d at 514.

Both cases, notably, involved fee arrangements among parties who, unlike an examiner, are not required to remain disinterested. *Compare* 11 U.S.C. § 1104(d) (trustees and examiners must be "disinterested") *and id.* § 327(a) (professionals employed by a trustee or a debtor in possession must be "disinterested"), *with id.* § 1103(b) (professionals employed by committees need not be "disinterested"). And neither case suggests that § 1129(a)(4) excuses an examiner from other requirements under the Code. *In re Cajun*, in point of law, states just the opposite, reasoning that it is "Congress's express provision for pre-payment judicial review of payments" in "[§] 330, provid[ing] for the award of 'reasonable compensation' to . . . an examiner,'" and in "§ 331[,] provid[ing] that . . . an examiner . . . may apply for interim compensation," that "renders its silence with respect to the timing of the judicial determination of the reasonableness of a payment subject to § 1129(a)(4)

meaningful." *Id.* at 515. These cases, in short, do not support Schilling's claim (Appellant Br. at 38) that he "could have *been paid* a fee by the Banks and Mapco" without violating the Code "as long as *before* the plan was confirmed the payment was subject to approval by [the bankruptcy court]."

### B.

Schilling next argues that two sections of the Bankruptcy Code—§ 326 and § 328(a)—permit an examiner to receive a percentage-based fee. Section 326 provides in pertinent part that "reasonable compensation" for a trustee may "not [] exceed 3 percent of such moneys in excess of $1,000,000 upon all money disbursed or turned over in the case by the trustee to parties in interest." As Schilling correctly observes, some bankruptcy courts read § 326 of the Code to allow trustees to receive compensation in the form of a percentage of the assets distributed, at least in small Chapter 7 cases. *See, e.g., In re Ohio Ind., Inc.*, 299 B.R. 853, 859 (Bankr. N.D. Ohio 2003) ("Oftentimes, in smaller Chapter 7 cases, the trustee is paid the maximum fee permitted under 11 U.S.C. § 326(a). This recognizes that in smaller cases trustees provide services that are worth at least as much as the § 326(a) cap. The same results do not follow in larger cases."). *But see Connolly v. Harris Trust Co. (In re Miniscribe Corp.)*, 309 F.3d 1234, 1243 (10th Cir. 2002) ("[W]e reject a [] percentage-based rationale for calculating reasonable trustee compensation . . . ."). Section 328(a) allows trustees and committees to employ counsel "on a contingent fee basis."

Neither provision advances Schilling's cause. Even though § 326 has been construed by some bankruptcy courts to permit a percentage-based fee in Chapter 7 cases and even though § 328(a) permits counsel for a trustee to seek a contingency-fee arrangement, these provisions do not authorize Schilling's distinct conduct. They do not permit a trustee (or counsel for a trustee) to solicit percentage-based

compensation from some but not all of the creditors, to reach an agreement with one of them, to do so secretively without disclosure to the court or the other parties, or to deceive the other parties about the undertaking.

The argument also overlooks the distinct obligations of trustees and examiners on the one hand and counsel for trustees on the other. The former owe fiduciary obligations to the estate and its myriad interests and thus serve multiple masters. The Code, accordingly, does not allow their compensation to be tied to a particular party's recovery. The latter owe fiduciary duties to their client (the trustee) and serve only one master. No conflict, accordingly, is created by tying the attorneys' compensation to recoveries in the very matters for which they were hired.

Schilling's reliance on *Architectural Bldg. Components v. McClarty (In re Foremost Mfg. Co.)*, 137 F.3d 919 (6th Cir. 1998), is unavailing for much the same reason. There we suggested that a trustee could negotiate an agreement with an unsecured creditor to have the creditor pay the fee of the trustee's counsel in a discrete matter that benefitted the estate and the creditor. *See id.* at 924. *See also* 11 U.S.C. § 327(c) (permitting counsel for the trustee to be counsel for a creditor, unless the United States Trustee objects). Neither *In re Foremost Mfg. Co.* nor § 327(c), however, says that a trustee may negotiate his personal compensation with a particular creditor.

### C.

Schilling also contends that his oral agreement with one creditor and his negotiations with three creditors to receive a percentage of their recovery created no conflict of interest with the other creditors or with the estate. In Schilling's words, his "interests were wholly and congruently aligned with those of the estate." Appellant Br. at 44. Schilling analogizes his circumstances to a Chapter 7 trustee being paid

a percentage of the assets distributed. No one would suggest that the trustee has an improper interest, he adds, just because the more the creditors and equity holders recover the more the trustee earns. If everyone benefits, in other words, no conflict can exist.

The argument, however, does not square with reality or with what Schilling in fact did. Schilling *secretly* negotiated compensation tied to *some* creditors' recovery; he did not openly ask the court to award him a percentage of the estate's growth or of all creditors' and equity holders' recovery. While a rising tide may indeed lift all boats, the deal he set out to negotiate gave him an incentive to lift only four boats—three unsecured creditors' and his own—which is exactly the problem of divided loyalties that the Code and the common law have long worked to avoid.

Schilling next argues that this reasoning rewrites the Code to require something that it does not—that an examiner remain "neutral." As Schilling observes, the district court several times referred to the requirement that an examiner remain "neutral," a requirement nowhere found in the Code or Rules. By "neutral and disinterested," however, the district court clearly meant "impartial and disinterested," which the Code does require. *See* 11 U.S.C. § 101(14); *Wissman v. Pittsburgh Nat'l Bank*, 942 F.2d 867, 872 (4th Cir. 1991) ("The trustee . . . has a duty to administer the estate impartially for the good of each and all of the creditors. No interest, except that of the estate, should be his consideration.") (quotation and citation omitted); *In re Gibbons-Grable Co.*, 135 B.R. 514, 516 (Bankr. N.D. Ohio 1991) ("A trustee has a duty to the estate's creditors to provide impartial administration for their benefit."); *Collier* ¶ 1108.09[4] (discussing a trustee or debtor in possession's "duty of impartiality"); *id.* ¶ 1108.09[4][d][ii] (Although "to conclude that a trustee . . . is duty bound to serve all interests all of the time, or even some interests all of the time, strains logic as well as the provisions of the Code[,] . . . a trustee . . .

[is] required to exercise due care . . ., refrain from self-dealing . . . and, when conflicts among constituencies do arise, negotiate honestly and in good faith in support of the particular position that [he] determine[s] to be appropriate . . . .").

### D.

Schilling also takes issue with many of the district court's factual findings. He asserts, for instance, that he had no agreements, only negotiations, with the creditors before July 31, 1997, when he received Chase's written agreement and promptly filed it with the court. The district court, however, found that "[i]n the January 27, 1997 telephone call from the Examiner to Mr. Daniello of Chase, they reached an agreement in principle . . . whereby Chase agreed to pay [] him a fee calculated according to how much he increased its recovery or decreased its exposure." 284 B.R. at 589. The record amply supports this finding, which accordingly is not clearly erroneous.

Schilling further asserts that he did not solicit Bank of New York, Mapco and Chase to pay his fees from their funds, only to support his request for a percentage fee to be paid by the estate. The record does not clearly reflect whether Schilling indicated *whom* he expected to pay this fee when he *first* raised the issue at the Washington meetings. One possibility is that he proposed that the three creditors pay him three percent of the increased amount that they received from Big Rivers. Another possibility, as Schilling now argues and as representatives of the three creditors recalled in their deposition testimony, is that Schilling merely suggested that he should receive three percent of the new value without indicating who would foot the bill. In view of the light cast by the later January 1997 letters, in which *Schilling says* that the three creditors would pay the fee, we cannot conclude that the district court committed reversible error in making this finding.

Schilling also claims that he did not negotiate his percentage fee in secret. "The possible fee arrangement," he asserts, "was broadly disclosed." "In fact," says Schilling, "the discussions were known to Bankruptcy Judge Roberts, the [United States Trustee], Big Rivers and all creditors then actively involved in the case not later than November 13, 1996." Appellant Br. at 53. In making this argument, however, Schilling omits several important details. The bankruptcy court, the United States Trustee and some creditors, it is true, were aware that Schilling might seek an enhanced fee and specifically one that turned on a percentage of new value created for the estate. But the record supports the district court's finding that only Schilling and the three creditors (Bank of New York, Mapco and Chase) knew that he was negotiating to have *the three creditors* pay him a percentage of their recovery. And this fact, no one argues, was ever disclosed.

### E.

Schilling lastly argues that several procedural impediments barred the district court from reaching the disgorgement issue. His principal objection is that no one had standing to raise the disgorgement issue—not the Utilities Service, not the United States Trustee, not Big Rivers, not any of its member cooperatives. Some of the parties lacked a sufficient financial stake in the outcome to have standing, Schilling argues, and others waived their challenges to the fee. The district court disagreed, and so do we. Even if the Utilities Service, the United States Trustee, Big Rivers and its member cooperatives all lacked standing (a doubtful proposition), the district court would still have standing to raise the issue on its own. Section 105(a) of the Bankruptcy Code itself provides ample authority: "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to . . . prevent an abuse of process." *See In re Busy Beaver Bldg.*

*Ctrs., Inc.*, 19 F.3d 833, 841 (3d Cir. 1994) (holding that a bankruptcy court (or district court, if the reference has been withdrawn) has authority to review a fee application on its own initiative, whether or not any party objects to it).

Schilling responds that § 105 does not allow a court to override contrary provisions elsewhere in the Code and accordingly "Section 105 cannot trump Section 1129(a)(4)." Reply Br. at 18. But this point goes to the merits of the disgorgement issue, not to whether anyone has standing to raise it. He also notes—correctly—that the district court did not rely on § 105. But since we review judgments, not reasoning, the contention is unavailing. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("[T]his Court reviews judgments, not opinions.").

Schilling next contends that the district court exceeded the scope of the remand order and disregarded "the law of the case." Appellant Br. at 26. The bankruptcy court, recall, initially granted the examiner's fee application (without the benefit of the evidence at Judge Cohn's disposal). Several parties appealed to the district court, which, acting as an appellate court, affirmed in part and reversed in part. Concluding that the issue of disgorgement was not decided by the bankruptcy court, District Court Judge McKinley "remand[ed] the case to the Bankruptcy Court for proper resolution of this issue," including "whether the Examiner negotiated and obtained certain side compensation agreements with various creditors." *In re Big Rivers Elec. Corp.*, 252 B.R. at 687–89.

Schilling argues that by using the conjunctive—"negotiated and obtained"—Judge McKinley established the "law of the case," which on remand allowed Judge Cohn to order disgorgement "*only if*" he found both that "(1) negotiations occurred between the Examiner and creditors (which was undisputed) *and* (2) an agreement was reached between the Examiner and these creditors." Appellant Br. at 27. But

these few words do not bear the weight Schilling places on them. The remand order concerned the "proper resolution" of the "issue of disgorgement," and had no other strings attached. 252 B.R. at 689. At all events, the district court found, and we do not doubt, that Schilling reached an oral agreement with Chase no later than January 1997. *See* 284 B.R. at 589.

Nor, contrary to Schilling's position, did the "law of the case" make it an abuse of discretion for the district court to deny Schilling's counsel fees on the ground that Schilling and his counsel were "essentially the alter ego" of one another. *Id.* at 583. According to Schilling, an earlier district court decision, which held that for purposes of a jurisdictional issue "there is a distinction between [Schilling and his law firm]," JA 492, established the law of the case. We disagree. Until the district court ordered Schilling and the "Law Firm of J. Baxter Schilling" to disgorge all fees, no court had ever decided whether to hold both Schilling and his law firm (sole member, Schilling) accountable for the conduct at issue here. Schilling in the end may not retain what Schilling must disgorge.

\* \* \* \* \*

As this case illustrates, being a bankruptcy examiner, like being a bankruptcy trustee, "is serious business and is not to be undertaken lightly." *Mosser*, 341 U.S. at 274. And the "most effective sanction for good administration" of these indispensable positions of trust remains sanctions "for the consequences of forbidden acts," *id.*, including on this occasion the remittance of nearly $1 million in legal fees. While this sanction "creates a very heavy liability" and while it confirms that the position of examiner should not be "undertaken lightly," *id.* at 273–74, the job remains one for which mere mortals may apply. As Justice Jackson observed in *Mosser*, "there are ways by which a trustee," like an examiner, may effectively protect against such sanctions. *Id.*

at 274.   Whether it is the business-judgment rule which shields fiduciaries from liability for "disinterested mistakes in business judgment," the all-purpose utility of full disclosure, or the "well established" practice of seeking "instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment," *id.*, examiners have ample ways to ensure that they honor the unremitting duties of loyalty and disinterestedness and avoid the liabilities imposed here.

## VI.

For these reasons, we affirm the district court's judgment.